J-S05028-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: V.E.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.A.M. AND R.B.M. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2284 EDA 2024 |

Appeal from the Order Entered August 1, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000145-2021

BEFORE: BOWES, J., MURRAY, J., and STEVENS, P.J.E.*

MEMORANDUM BY MURRAY, J.: **FILED FEBRUARY 24, 2025**

C.A.M. and R.B.M. (Petitioners) appeal from the order denying their petition to adopt V.E.H. (Child), a minor girl born in November 2020, and directing Child to remain in the care of B.R. and N.R. (Adoptive Parents). After careful review, we affirm.

The trial court summarized the relevant factual and procedural history:

[Child] was placed in the [neonatal intensive care unit (NICU)] at birth because she was born prematurely and had cannabis and methadone in her system. On December 3, 2020, the Philadelphia Department of Human Services ("DHS") met with [Child's] biological parents[, B.L. (Mother) and C.H. (Father),] who both agreed they were not able to provide [Child] with sufficient proper

_____

* Former Justice specially assigned to the Superior Court.

care.[1]   [Mother and Father] suggested placing [Child] with [Adoptive Parents] as kinship resources.[2]   [Child] was subsequently placed with [Adoptive Parents] after her discharge from the NICU.

[Mother] had three other children prior to [Child] being born.  All three of those children were adopted by [Petitioners[3]] and have remained in their care since then.  [On April 19, 2021, Adoptive Parents filed a report of intention to adopt Child.]  On May 7, 2021, DHS filed a motion for change of placement for [] Child in an attempt to have [Child] removed from [Adoptive Parents'] home and placed with [Petitioners].  On March 31, 2022, the [trial] court ruled that [Child] was to remain with [Adoptive Parents].  After … the court ruled that [Child] was to remain with [Adoptive Parents], [Petitioners] stopped bringing [Child's] siblings to visitations, despite [Child's] social worker's attempts to contact [Petitioners].

On December 7, 2022, [Mother's and Father's] parental rights [were] involuntarily terminated, and [Child's] goal was changed to adoption. …  On May 1, 2023, DHS provided consent to adopt paperwork [pertaining to Adoptive Parents]….

Trial Court Opinion, 10/30/24, at 1-2 (original footnotes omitted; footnotes and paragraph break added; some capitalization altered).

On June 5, 2023, Adoptive Parents filed a petition to adopt Child. Adoptive Parents attached thereto a "report of intermediary" prepared by

_____

[1] DHS also filed a dependency petition as to Child in late December 2020.  The dependency action is not at issue in the instant appeal.  In fact, the trial court denied Petitioners' motion to consolidate the dependency and adoption cases.

[2] Adoptive Parents each testified Mother is a family friend.  **See** N.T., 5/16/24, at 39, 41, 84-85, 104.

[3] Petitioner R.B.M. (Cousin) is Child's maternal cousin.  **See** N.T., 5/30/24, at 130.

Delta Family Services (Delta).  ***See*** Adoptive Parents' Petition to Adopt, 6/5/23, Exhibit C (report of intermediary).

On July 14, 2023, Petitioners filed a petition to adopt Child.

The trial court conducted hearings on the competing petitions to adopt on May 16, May 30, and August 1, 2024.  Child's interests were represented by her guardian *ad litem* (GAL).  During these hearings, the trial court heard testimony from both Petitioners, both Adoptive Parents, two of Child's biological siblings, and various professionals who worked with Child or one of the families throughout the history of this case.

At the start of the May 16, 2024, hearing, DHS attorney Michael Mon, Esquire, stated DHS would consent to Child's adoption by either Petitioners or Adoptive Parents.  N.T., 5/16/24, at 30.

Significantly, Child's GAL testified that permitting Child to remain with Adoptive Parents, and to allow them to be adoptive resources, would be in Child's best interests:

> [E]very witness, for the three[-]and[-]a[-]half years that I've been on this case, from [the community umbrella agency (CUA)] has always come in and said that … [Adoptive Parents'] house is appropriate, [C]hild is loved, well cared for, bonded.
>
> Frankly, as a matter [of] fact, I've been to [Adoptive Parents'] home and I've seen [Child] with them in public, and if I didn't know they were in foster care, I simply just would think that [Child is] their daughter.  That's exactly the home we need.
>
> … [F]or three[-]and[-]a[-]half years, [Child] has been bonded with [Adoptive Parents].

And it's going to be absolutely devastating if the [c]ourt was to remove [C]hild from [her] home because … [Child] was born [in November] 2020. 30 days later, [Child was placed with Adoptive Parents and] has been with [Adoptive Parents continuously].

….

… [**F**]**rankly, this is a very clear-cut case, and** [**Child**] **really needs and deserves to stay with** [**Adoptive Parents**], and [they] should really be the adoptive resources.

*Id.* at 34-36 (emphasis added).[4]

During the adoption hearing, Adoptive Parents testified on their own behalf. Adoptive Parents also offered the testimony of Kanesha White (Ms. White), a case manager for CUA Bethanna; Dr. Erica Williams (Dr. Williams);[5] and Erin Hagenbuch (Ms. Hagenbuch), a permanency worker at Delta.

N.R. (Adoptive Father) testified Child has lived in Adoptive Parents' home since December 2020. *Id.* at 38. Adoptive Father testified sibling visitation began in February 2022, and the visits took place once a week for approximately six weeks. *Id.* at 46. According to Adoptive Father, he did not interact with Petitioners during the sibling visits. *Id.* at 46-47; *see also id.*

_____

[4] During his closing statements, Child's GAL reiterated his position that it would be in Child's best interest to remain with Adoptive Parents. *See* N.T., 8/1/24, at 108-13; *see also id.* at 108 (GAL stating, "[Child] has been [with Adoptive Parents] for three and a half years. That's her entire life. And [Child] doesn't see a foster parent or kinship parent; what she sees is a mother and a father.").

[5] Dr. Williams was not permitted to testify as an expert because her curriculum vitae and expert report were not properly disclosed prior to the close of discovery. *See* N.T., 5/30/24, at 14-30.

at 47 (Adoptive Father stating he did not prevent the visits from occurring), 51 (Adoptive Father testifying he never interacted with Child's siblings). Adoptive Father testified that, beginning in December 2023, Adoptive Parents and Petitioners were not permitted inside the visitation room during the sibling visits, pursuant to a court order. *Id.* at 48. By that time, Adoptive Father stated, the visits took place once per month. *Id.* at 48-49.

Adoptive Father testified he is amenable to continuing the sibling visits if Adoptive Parents are permitted to adopt Child:

> Your Honor, we have no problem with [Child] knowing she has siblings, and [keeping] the siblings in her life. … So, we still do the visitations. We have no problem with the visitations. [Child] has … siblings in her life, and we understand that. There's nothing we can change about that….

*Id.* at 50 (paragraph break omitted). Additionally, Adoptive Father testified Child has contact with Mother and Father "at least three or four times a month[.]" *Id.* at 43.

B.R. (Adoptive Mother) testified Adoptive Parents brought Child home from the hospital on December 7, 2020. *Id.* at 85-86. Adoptive Mother indicated Child required special medical care after her discharge from the hospital. *Id.* at 89-90; *see also id.* at 90 (Adoptive Mother explaining Child participated in physical therapy for approximately two years).

Regarding the sibling visits, Adoptive Mother testified Child "clings to [Adoptive Mother]" when being dropped off for visits. *Id.* at 96. Adoptive Mother confirmed she never interfered with the sibling visits or prevented

them from taking place. *Id.* Further, Adoptive Mother testified she has no intention of keeping Child away from her siblings. *Id.* Adoptive Mother confirmed Child visits with Mother and Father "at least once a month." *Id.* at 97.

Adoptive Mother testified that she "do[es] everything with" Child. *Id.* at 99. Adoptive Mother explained that she and Adoptive Father take Child to all of her doctor's appointments. *Id.*; *see also id.* at 100 (Adoptive Mother explaining she and Child enjoy going to the park together, going to the zoo, and playing tea party). Child also plays on two soccer teams. *Id.* at 101.

Next, Adoptive Parents offered the testimony of Ms. White. Ms. White explained she was assigned to this case in February 2023, and completes monthly home visits at Adoptive Parents' home. N.T., 5/30/24, at 32. Based on her observations, Ms. White testified that Adoptive Parents "appear to have a really good bond with [Child]." *Id.* at 34; *see also id.* at 35 (explaining Child addresses Adoptive Parents as her mother and father, and seeks them for comfort). Ms. White has also observed four of the sibling visits. *See id.* at 36. Ms. White testified that "it is kind of hard to get [Child] to detach from [Adoptive Parents] to start the visit," but that she warms up to her siblings during their visits. *Id.* Ms. White stated she believes Adoptive Parents are an appropriate resource for Child. *Id.* at 47; *see also id.* at 50 (Ms. White confirming she has no concerns regarding Adoptive Parents' care of Child).

Dr. Williams met Child in February 2024. *Id.* at 54. Dr. Williams observed Child interacting with Adoptive Parents during approximately an hour and a half of playtime. *Id.* Dr. Williams testified regarding her observations:

[Child] brought [Adoptive Mother] right over to the dolls, and they all started there and with the pretend food.

And throughout the observation [Child] would pick up different toys. And she would seek the proximity of [Adoptive Parents], bring them items, want to interact with the items. [Adoptive Parents] would engage with her. They would do pretend play.

[Adoptive Parents] would label the toys if [Child] wasn't able to. Kind of ask her, "What's this? What are you doing?"

In the kitchen you could complete tasks like cut vegetables, and [Adoptive Parents] would celebrate when [Child] could cut it. There were certain toys that [Child] would struggle with. And [Adoptive Parents] were observed to sit back and watch the struggle, and [Child] would work through it sometimes. Other times, her frustration would increase.

And then [Adoptive Parents] would offer help. They would respect if [Child] said, "No." They would help if [Child] said, "Yes." There w[ere] instances many times throughout where [Child] would try to eat the pretend food.

[Adoptive Parents] would redirect [Child]. She would respond. There w[ere] specific toys [Adoptive Parents] deemed unsafe for [Child]. And [Child] very much wanted them. [Adoptive Parents] told her, "No." [Child] pushed back. She fought. She was sad.

And [Adoptive Parents] remained very consistent with, "No. This is not a safe toy." They provided alternatives.

[Adoptive Parents] provided music when [Child] seemed like she needed a little bit more. So throughout it, [Adoptive Parents]

interacted with [Child] and let her set the tone. But [Adoptive Parents] provided that overall safety and structure.

*Id.* at 56-58. Dr. Williams testified she did not identify any concerns with Adoptive Parents during her observation. *Id.* at 58. Further, Dr. Williams testified that Child refers to Adoptive Parents as "Mom" and "Dad," and that Adoptive Parents appear to be Child's direct caretakers. *Id.* at 58, 60.

Ms. Hagenbuch, Adoptive Parents' permanency worker, testified she has visited Adoptive Parents' home approximately 12 or 13 times. *Id.* at 66-67. Ms. Hagenbuch stated she completes a monthly home safety check and has never had any concerns about Adoptive Parents. *Id.* at 67-68. According to Ms. Hagenbuch, Child refers to Adoptive Parents as "Mom" and "Dad" and is very bonded with both Adoptive Parents. *Id.* at 68, 70. Ms. Hagenbuch has never met Petitioners or observed Child interact with her siblings. *Id.* at 73. Ultimately, Ms. Hagenbuch testified to her belief that it is in Child's best interest to be adopted by Adoptive Parents, as she has lived in their home since she was one month old, and Adoptive Parents are the only family she has known. *Id.* at 78; *see also id.* at 83 (Ms. Hagenbuch describing Child as having a loving relationship with Adoptive Parents and being happy and comfortable in Adoptive Parents' home).

Petitioners testified on their own behalf. Petitioners also offered testimony from two of Child's siblings;[6] Amy Holmes (Ms. Holmes), the regional director of Children's Choice; Karen Park (Ms. Park), the state director of Children's Choice; and Staci Morgan (Ms. Morgan), the DHS operations director.

A.M., who was 14 years old at the time of the hearing, testified she is Child's biological sister. *Id.* at 93. A.M. testified that she felt devastated when she learned Child would not be placed in Petitioners' home. *Id.* at 101, 124. A.M. stated she brought toys and gifts for Child to the sibling visits in 2022, but Adoptive Parents did not take those items home. *Id.* at 103. A.M. also testified that Adoptive Parents retrieved Child quickly following the sibling visits, and A.M. often did not have the chance to say goodbye to Child. *Id.* at 106. A.M. acknowledged that Child appeared to be bonded with Adoptive Father. *Id.* at 128.

Cousin testified she is Child's maternal cousin, and that she and her husband previously adopted Child's three siblings. N.T., 5/30/24, at 130-31, 135-36. Cousin testified the first court-ordered visit took place in February 2022. *Id.* at 152. During that visit, Petitioners and Adoptive Parents remained in the room with Child and her siblings. *Id.* at 156. According to

---

[6] L.M., who was 11 years old at the time of the hearing, wrote a letter, which was introduced as an exhibit. N.T., 5/30/24, at 86-91. L.M.'s testimony was used solely to confirm her authorship of the letter.

Cousin, Adoptive Parents "distract[ed Child] in the visits, so that she could not spend time with her siblings." *Id.* at 159. Cousin also testified Child's siblings brought toys and gifts to the visits for Child, but Adoptive Parents refused to take the gifts with them. *Id.* at 160.

Cousin affirmed the relationship between Petitioners and Adoptive Parents is "strained." *Id.* at 164. When asked if she would allow Child to maintain a relationship with Adoptive Parents if Petitioners were permitted to adopt Child, Cousin replied, "I would entertain it." *Id.* Cousin later stated Child's siblings are "not comfortable" with Adoptive Parents. *Id.* at 171, 175.

Similarly, Petitioner C.A.M. testified that during the 2022 sibling visits, Child's siblings brought toys and gifts for Child, but Adoptive Parents would not take the gifts home. N.T., 8/1/24, at 10. C.A.M. testified Child appeared to have fun during the sibling visits. *Id.* at 11. Regarding the importance of a sibling bond, C.A.M. testified:

> Your Honor, I've been blessed with three kids and … I have siblings myself, and I believe the sibling bond is going to be something that our kids are going to be able to cherish and keep forever, and I just can't imagine [Child] growing up or being deprived of not having that same sibling bond and getting to grow up with her -- in her home, with her siblings.

*Id.* at 16-17. C.A.M. stated that if Petitioners were permitted to adopt Child, he would "highly consider" allowing Adoptive Parents to maintain contact with Child. *Id.* at 17. When asked if he would be open to continuing sibling visits if Adoptive Parents were allowed to adopt Child, C.A.M. responded:

That would be something that would have to be considered, but to be honest, Your Honor, … [Child's siblings] do not feel comfortable around [Adoptive Parents]. … So, honestly, that consideration is tough for me to come up and say yes, let your kids go with strangers. I can't do that.

*Id.* at 22 (paragraph break omitted).

Next, Petitioners presented the testimony of Ms. Holmes. According to Ms. Holmes, Petitioners contacted Children's Choice in November 2022 to complete a private family profile for adoption. N.T., 8/1/24, at 28. Ms. Holmes prepared Petitioners' family profile and recommended Petitioners be approved to adopt Child. *Id.* at 32-33. Ms. Holmes acknowledged that she had never met Child or observed Child's interactions with her siblings. *Id.* at 37.

Ms. Park explained Petitioners have worked with Children's Choice since 2013, but that Petitioners most recently contacted Children's Choice after learning of Child's birth. *Id.* at 43. Children's Choice then reopened Petitioners' file and relicensed Petitioners' home for kinship care. *Id.* at 44, 46-47. Ms. Park also acknowledged she has never met Child. *Id.* at 57.

Ms. Morgan explained she became involved in this case in 2021, after a concern was raised about Child's placement. *Id.* at 63. Ms. Morgan testified DHS consents to Child's adoption by either Petitioners or Adoptive Parents. *Id.* at 77.

Finally, DHS introduced the testimony of permanency worker Ms. Parker, who was assigned to the case in 2023. *Id.* at 84-85. As Ms. Parker explained, her role as a permanency worker

> is to review … the child and family profiles, to process the consent to adopt, to ensure we have the necessary paperwork for the attorneys to file the adoption petition, and to ensure that adoption occurs in a timely manner.

*Id.* at 85. Ms. Parker visited Child in Adoptive Parents' home and observed two of the sibling visits. *Id.* Ms. Parker testified that Adoptive Parents are loving, and Child's needs are met within Adoptive Parents' home. *Id.* at 86. Ms. Parker also testified that Child became more interactive with her siblings during the second visit she observed. *Id.* at 87. Ms. Parker stated she believes Petitioners' home would be best for Child, given that Child's siblings reside with Petitioners. *Id.* at 88. Nevertheless, Ms. Parker testified both homes are safe and appropriate, and DHS consents to adoption by either Adoptive Parents or Petitioners. *Id.* at 86-88.

At the close of the August 1, 2024, hearing, the trial court determined it would be in Child's best interest to remain with Adoptive Parents, and denied Petitioners' petition to adopt. *See* N.T., 8/1/24, at 114-15. The court encouraged all parties to help facilitate a relationship between Child and her

siblings. *See id.* at 115-16. The trial court memorialized its determinations in an order entered on the same date. Order, 8/1/24.[7]

Petitioners filed a timely notice of appeal. Petitioners simultaneously filed a concise statement of errors complained of on appeal in accordance with Pa.R.A.P. 1925(a)(2)(i), raising nine issues.[8]

Petitioners raise the following issue for review:

> Did the [trial court] misapply governing law or abuse its discretion in denying [Petitioners'] petition for the adoption of [C]hild, … and determining that it was in the best interest of [Child] to be adopted by [Adoptive Parents] … instead?

Petitioners' Brief at 2.[9]

Petitioners argue the trial court's denial of Petitioners' petition to adopt was manifestly unreasonable. Throughout their argument, Petitioners

---

[7] The trial court did not grant Adoptive Parents' petition to adopt at the close of the hearing or in its written order. Instead, the order states: "Child is to remain in the home of [Adoptive Parents]. Child is free to be Adopted." Order, 8/1/24.

[8] On January 7, 2025, Adoptive Parents filed a motion to dismiss Petitioners' appeal, citing Petitioners' failure to file a designation of contents of the reproduced record and the appellate brief's nonconformity with our Rules of Appellate Procedure. *See generally* Motion to Dismiss, 1/7/25. In response, Petitioners argue Adoptive Parents failed to establish they were prejudiced by any alleged deficiencies in Petitioners' appellate brief. *See generally* Answer, 1/7/25. By an order entered January 13, 2025, this Court deferred the matter to the merits panel. We decline to dismiss Petitioners' appeal.

[9] DHS filed a letter with this Court stating it consents to adoption by either Petitioners or Adoptive Parents. *See* DHS Letter, 12/23/24. Additionally, Child's GAL filed a letter stating his intention to join Adoptive Parents' brief. *See* GAL Letter, 1/13/25.

repeatedly emphasize their biological relationship to Child, and contend the trial court effectively ignored "Pennsylvania's law and policy that siblings should be raised together whenever possible." Petitioners' Brief at 19; *see also id.* at 17-24.[10] Petitioners argue the trial court failed to render a finding that there are compelling reasons to separate the siblings. *Id.* at 20-22. Petitioners claim there would be psychological benefits to Child if she were raised with her siblings in Petitioners' home. *Id.* at 21.

Petitioners also point to a lack of evidence concerning the extent of Child's bond with Adoptive Parents, or whether Child would suffer irreparable harm if she were removed from Adoptive Parents' care. *Id.* at 22. Seemingly acknowledging a bond between Child and Adoptive Parents, however, Petitioners argue "[t]he long-term benefits of [Child] growing up alongside her three biological siblings outweigh the short-term discomfort of transitioning to

_____

[10] We observe that Petitioners cite regulatory and case law that is not directly relevant to proceedings under the Adoption Act. For instance, Petitioners cite 237 Pa. Admin. Code Rule 1514 (Dispositional Finding Before Removal from Home), which addresses a child's initial removal from his or her home in dependency proceedings. Further, Petitioners rely on caselaw addressing dependency and custody proceedings. *See In re H.V.*, 37 A.3d 588 (Pa. Super. 2012) (reviewing the appointment of a legal custodian for the child, and a goal change in the child's dependency proceedings); *In re L.J.*, 691 A.2d 520 (Pa. Super. 1997) (addressing a party's standing to challenge the child's goal change in dependency proceedings); *In Interest of Tremayne Quame Idress R.*, 429 A.2d 40 (Pa. Super. 1981) (considering an order granting custody of the child to child's foster mother rather than to child's maternal grandmother); *Com. ex rel. Steuer v. Steuer*, 368 A.2d 732 (Pa. Super. 1976) (considering the trial court's award of custody to the child's father).

- 14 -

[Petitioners'] home." ***Id.*** To "mitigate" the disruption to Child's bond with Adoptive Parents, Petitioners suggest the trial court should implement a "planned transition," with gradual increases of Child's visitation time with her siblings and Petitioners. ***Id.***

Additionally, Petitioners contend Adoptive Parents used "intimidation tactics" against Child's siblings. ***Id.*** at 25. According to Petitioners, Adoptive Parents' behavior obstructs Child's relationship with her siblings, which is contrary to Child's best interests. ***Id.***

Petitioners also assert the trial court improperly considered Mother's desire for Child to be placed with Adoptive Parents. ***Id.***

We are mindful of our standard of review:

> In matters arising under the Adoption Act, our plenary scope of review is of the broadest type; that is, an appellate court is not bound by the trial court's inferences drawn from its findings of fact and is compelled to perform a comprehensive review of the record for assurance the findings and credibility determinations are completely supported. Additionally, our standard of review is for an abuse of discretion. This Court will not conclude that there is an abuse of discretion merely because we would have reached a different conclusion. Rather, an appellate court will find a trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will.

***In re Adoption of K.B.***, 311 A.3d 1166, 1169 (Pa. Super. 2024) (citations and quotation marks omitted).

In adoption proceedings, "the best interest of the child is the paramount consideration." ***In re Adoption of J.E.F.***, 902 A.2d 402, 412 (Pa. 2006)

- 15 -

(citation omitted). Section 2902 of the Adoption Act requires the trial court to determine whether adoption would promote the child's needs and welfare:

> If satisfied that the statements made in the petition are true, that the needs and welfare of the person proposed to be adopted will be promoted by the adoption and that all requirements of this part have been met, the court shall enter a decree so finding and directing that the person proposed to be adopted shall have all the rights of a child and heir of the adopting parent or parents and shall be subject to the duties of a child to him or them.

23 Pa.C.S.A. § 2902(a). "This 'best interests' determination is made on a case-by-case basis, and requires the weighing of all factors, which bear upon a child's physical intellectual, moral, and spiritual well-being." *In re Adoption of A.M.W.*, 289 A.3d 109, 114 (Pa. Super. 2023) (*en banc*) (citation omitted); *see also In re Adoption of D.M.H.*, 682 A.2d 315, 319 (Pa. Super. 1996) (stating that "a trial court must base its conclusions in an adoption case upon all relevant information discerned with the full participation of all interested parties.").

Preliminarily, we note that the Adoption Act does not expressly state that biological relatives must be given preference in a contested adoption proceeding. *See generally Adoption of D.M.H.*, 682 A.2d at 315 ("[O]nce parental rights have been terminated, anyone may become an adoptive parent, and the best interest of the child is the controlling factor by which a court must be guided.").

> We are mindful that, when possible, the preservation of the family is the desired outcome in custody matters. However, **the goal of preserving the family unit cannot be elevated above all**

**other factors when considering the best interests of the child**[], but must be weighed in conjunction with other factors.

*In re K.D.*, 144 A.3d 145, 153 (Pa. Super. 2016) (emphasis added; citation and quotation marks omitted); *see also Adoption of K.B.*, 311 A.3d at 1174 ("[A]lthough the existence of a biological relationship is a relevant factor to consider when evaluating an adoption petition, **it is not a controlling one**." (emphasis added)).

When issuing its determination at the close of the adoption hearings, the trial court acknowledged the unique history of this case. *See* N.T., 8/1/24, at 113-14. However, the court emphasized Adoptive Parents, "for all intents and purposes, are [Child's] mother and father." *Id.* at 114. In denying Petitioners' petition to adopt, the trial court stated:

> I do not believe it would be in [Child's] best interest to take her out of [Adoptive Parents'] home at this juncture. The connection that [Child has] formed with [Adoptive Parents], I don't believe should be undone, and I don't believe that the building of a bond with her siblings is sufficient to undo that. As a result, I'm going to dismiss [Petitioners'] petition. In doing so, I note this. If I had ruled the other way, I'd be terminating the relationship that I don't believe would ever be constructed again.

*Id.* at 114-15 (paragraph breaks omitted). Further, the trial court stated its hope that the two families could work together to permit Child to maintain a relationship with her siblings. *Id.* at 115-17.

The trial court additionally detailed its reasoning in its opinion.[11] The trial court emphasized that Child was placed with Adoptive Parents shortly after her birth and has remained with them ever since. *See* Trial Court Opinion, 10/30/24, at 7; *see also id.* (noting that Petitioners have never provided care for Child). Additionally, the court pointed to Ms. Parker's testimony that Child has a strong parent/child bond with Adoptive Parents. *Id.* at 8 (citing N.T., 8/1/24, at 90-91). While acknowledging the general importance of sibling relationships, the trial court concluded that, in this case, Child does not have a strong bond with her siblings. *Id.* at 8.

Upon we review, we agree with the trial court's determination, which is supported by the record and the law. Though Cousin's biological relationship to Child and Petitioners' adoption of Child's siblings could arguably support granting Petitioners' petition to adopt, those biological relationships are not controlling. *See Adoption of K.B.*, 311 A.3d at 1174. Faced with competing petitions to adopt, our review confirms the trial court carefully weighed the factors bearing upon Child's physical, intellectual, moral, and spiritual well-being in reaching its decision. *See Adoption of A.M.W.*, 289 A.3d at 114.

---

[11] We note that the trial court believed it was required to apply certain enumerated factors in reaching its decision. The Adoption Act does not mandate consideration of particular factors, and instead requires a court to discern the best interests of the child. *See Adoption of J.E.F.*, 902 A.2d at 412. Nevertheless, our review of the court's opinion and the record confirm the court used these "factors" to support its finding that Child's best interests are served by remaining with Adoptive Parents.

We discern no abuse in the trial court's discretion in concluding Child's best interests are served by remaining with Adoptive Parents, the only parents Child has ever known, and with whom Child shares a strong, loving parent/child bond. Accordingly, we affirm the trial court's order denying Petitioners' petition to adopt.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/24/2025