J-A25028-23

2024 PA Super 40

| | | |
|---|---|---|
| IN RE: ADOPTION OF K.B. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.S. AND P.S. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 738 WDA 2023 |

Appeal from the Decree Entered May 25, 2023
In the Court of Common Pleas of Indiana County Orphans' Court at
No(s): 32-21-0264

| | | |
|---|---|---|
| IN RE: ADOPTION OF N.M. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.S.AND P.S. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 739 WDA 2023 |

Appeal from the Decree Entered May 25, 2023
In the Court of Common Pleas of Indiana County Orphans' Court at
No(s): 32-21-0265

BEFORE:  BOWES, J., KUNSELMAN, J., and COLINS, J.*

OPINION BY KUNSELMAN, J.:          **FILED:  March 7, 2024**

A.S. and P.S. (Foster Parents) appeal from the decrees denying their petitions to adopt seven-year-old K.B. and five-year-old N.M. (the Children). They argue the orphans' court abused its discretion by effectively requiring them to enter a post-adoption contact agreement with D.O. (Maternal Aunt)

_____

* Retired Senior Judge assigned to the Superior Court.

before it would approve their adoption. Upon review, we reverse and remand for the court to enter decrees granting the Foster Parents' adoption petitions.

The relevant factual and procedural history follows. In February 2020, Indiana County Children and Youth Services (the Agency) removed K.B. and N.M. from their biological parents due to drug use and neglect. The Agency placed the Children with Foster Parents where they have resided continuously since. At the time of placement, the Children were four and two years old, respectively.

While in the care of Foster Parents, the Children were adjudicated dependent. During the dependency action, Maternal Aunt began visiting the Children and completed an Interstate Compact to be considered a kinship home for the Children. Because she resided in Florida, she was not considered a placement option. Since approximately June 2021, Maternal Aunt had bi-weekly supervised visits with the Children, both in-person and *via* Zoom.

On November 4, 2021, the orphans' court involuntarily terminated the parental rights of the natural mother and father. On appeal, this Court affirmed the termination decrees. Foster Parents then filed petitions to adopt the Children on June 24, 2022. Maternal Aunt filed counter-petitions for adoption on July 12, 2022. The court held a consolidated hearing on all the petitions in April 2023.

Foster Parents presented expert testimony from Bruce Chambers, Psy.D., a clinical psychologist. Dr. Chambers completed an assessment and authored a Psychological Evaluation for Custody. Foster Parents also

presented expert testimony from Carolyn Menta, Psy.D., a clinical psychologist. Dr. Menta authored two bonding assessments for Foster Parents and for Maternal Aunt. Foster Parents and Maternal Aunt testified as well. Lastly, the Children's guardian *ad litem* gave a statement to the court.

On May 25, 2023, after the hearing, the orphan's court issued opinions and decrees denying both Foster Parents' and Maternal Aunt's petitions for adoption. Foster Parents filed this timely appeal.[1] Foster Parents and the orphans' court complied with Pennsylvania Rule of Appellate Procedure 1925.

On appeal, Foster Parents present the following four issues:

1. Whether the trial court abused its discretion by denying [Foster Parents'] petition[s] for adoption of the subject [C]hildren, where the [Foster Parents] met their burden based on the best interest analysis, by showing that the [C]hildren have been thriving in their home and have a strong attachment to the [Foster Parents], and two psychologists support the adoption of the [C]hildren by [Foster Parents]?

2. Whether the trial court erred in denying [Foster Parents'] petitions for adoption of the subject [C]hildren, because the court determined that there must be continuing contact with the [C]hildren's [Maternal Aunt], which is not required by the Adoption Act under the best interests' analysis?

3. If the trial court was correct in considering continuing contact with the [Maternal Aunt], did the trial court place undue weight upon that continuing contact?

4. Whether the trial court erred in denying the [Foster Parents'] petition[s] for adoption of the subject children, which, in effect, has made the [C]hildren unadoptable orphans?

_____

[1] It does not appear Maternal Aunt appealed the court's decision denying her petitions.

Foster Parents' Brief at 4-5.

All these issues require us to resolve the essential question of whether the orphans' court erred or abused its discretion in determining that adoption by the Foster Parents was not in the Children's best interests. For ease of disposition, we address the issues together.

In matters arising under the Adoption Act, "our plenary scope of review is of the broadest type; that is, an appellate court is not bound by the trial court's inferences drawn from its findings of fact and is compelled to perform a comprehensive review of the record for assurance the findings and credibility determinations are competently supported." *Interest of K.N.L.*, 284 A.3d 121, 132-33 (Pa. 2022) (internal quotations and further citations omitted). Additionally, our standard of review is for an abuse of discretion. This Court will not conclude that there is an abuse of discretion merely because we would have reached a different conclusion. *In re K.D.*, 144 A.3d 145, 151 (Pa. Super. 2016) (citation omitted). Rather, an appellate court "will find a trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will." *Id.* (citation omitted). Where it is shown by evidence of record that the court's determination is manifestly unreasonable, we may modify it. *Id.* Thus, where the court abused its discretion and the record is sufficiently developed, this Court may, rather than remand the case, substitute our

judgment for that of the court's and decide the merits of the case. ***K.D.***, 144 A.3d at 151.

In adoption matters, the paramount concern is the best interests of the child. ***In re Adoption of A.S.H.***, 674 A.2d 698, 700 (Pa. Super. 1996) (citations omitted). This determination is made on a case-by-case basis. ***Id.*** The Adoption Act provides that "the age, sex, health, social and economic status or racial, ethnic or religious background of the child or adopting parents shall not preclude an adoption but the court shall decide its desirability on the basis of the physical, mental and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2724(b). "If satisfied that the statements made in the petition are true, that the needs and welfare of the person proposed to be adopted will be promoted by the adoption and that all requirements of this part have been met, the court shall enter a decree[.]" 23 Pa.C.S.A. § 2902(a).

At the outset of its opinion, the orphans' court explained why it believed it did not need to choose between the competing adoption petitions:

> [T]he [c]ourt faces two separate and distinct questions; the two questions are " does granting [Foster Parents' petition] serve the best interests of the [C]hildren?" and "does granting [Maternal Aunt's petitions] serve the best interests of the [C]hildren?" This is a best interests analysis in its purest form, as the [c]ourt is not constrained to [choose] between two equally undesirable options. In other words, the [c]ourt is not forced to make a Hobson's choice.
>
> A Hobson's choice is defined as "the necessity of accepting one of two or more equally objectionable alternatives." The [c]ourt begins its analysis with this definition for the purpose of affirmatively stating the [c]ourt's opinion that a court should ***never*** face a Hobson's choice when it comes to the adoption of a child. Therefore, the [c]ourt finds that it is a

fallacy that the [c]ourt must grant either the [Foster Parents petitions] or [Maternal Aunt's petitions]. To find otherwise would belie the paramount concern in an adoption proceeding, *i.e.*, the best interests of the child.

Orphans' Court Opinion, 5/25/23, at 5-6 (footnote and citation omitted).

The orphans' court then denied the Foster Parents' petitions for the following reasons:

> The court acknowledges the need for permanency for these Children. However, the court **declines to choose the lesser of two evils in an adoption matter**. It is important to note that denying [Foster Parents' petition] and denying [Maternal Aunt's petition] will not, in and of itself, legally result in the severing of the secure attachment between the children and [Foster Parents]. The children will remain in the care of [Foster Parents].
>
> It is the [court's] strong hope that the Children remain in the care of the [Foster Parents], and [they] commit themselves to the best interests of the Children, and in doing so, begin to foster and promote the Children's relationship with [Maternal Aunt] in a meaningful way. Should this happen, this court would be in a position to conclude that an adoption by [Foster Parents] would be in the best interests of the Children. Until then, the court cannot make such a finding. Therefore, [Foster Parents' petition] must be denied. If [Foster Parents] decide that they no longer want to provide foster care for the Children if they have to promote and facilitate a relationship with [Maternal Aunt], they will be sending a resounding message that adoption by them was never in the Children's best interests.

*Id.* at 13 (emphasis added) (style adjusted).

Similarly, the orphans' court denied Maternal Aunt's petitions:

> [D]espite the findings of the court regarding [Maternal Aunt's] fitness as an adoptive parent, the court cannot ignore the **clear conclusions** of Dr. Chambers and Dr. Menta. As stated above, Dr. Chambers concludes that the

Children have a strong, healthy attachment with [Foster Parents] that has been established over the 38 months in their care. Dr. Chambers opines that any change to this situation would cause undue stress on the Children, especially given the fact that they have already endured a traumatic removal from their caregivers.

As stated above, Dr. Menta concludes that disturbing the secure attachment with [Foster Parents] would be devastating to the Children. Dr. Menta stated that such a disturbance could destroy their mental health, and could result in the inability to form positive attachments as an adult.

Given the expert testimony received by the court, the court cannot find that it would be in the best interests of the children to grant [Maternal Aunt's petition]. This finding may appear inconsistent with the court's denial of [Foster Parents' petitions], however, as the court has stated several times, *a court should never be required to accept the lesser of two evils when faced with two adoption petitions.* Finally, and as stated above, it is the strong hope of the court that [Maternal Aunt], with the cooperation of [Foster Parents] and Indiana County CYS, begin to enjoy the growth of a meaningful relationship with the children, which will require periods of unsupervised physical "custody" of the children by [Maternal Aunt]. *If [Foster Parents] decide that they no longer wish to provide foster care to the children, the court believes that [Maternal Aunt] is in a position to care for the children.*

*Id.* at 15-16 (emphasis added) (style adjusted).

The orphans' court believed that the Children's best interests could not be met under the confines of the Adoption Act:

The [c]ourt is asked to apply a "child custody" analysis construct to this adoption proceeding, however, unlike a custody proceeding, the [c]ourt is unable to grant [Foster Parents' petitions] and award [Maternal Aunt] periods of partial physical custody. Given these legal constraints, and

- 7 -

> given the facts of this matter as they presently exist, the best interests of the child cannot be achieved.

*Id.* at 16 (style adjusted).

On appeal, Foster Parents claim that the orphans' court abused its discretion when it denied their petitions to adopt the Children. Specifically, Foster Parents argue that they presented evidence demonstrating that the Children had a strong, secure bond and attachment to them and that the Children were thriving in their care; as such, they established that it was in the best interests of the Children for the court to grant their adoption petitions. *See* Foster Parents' Brief at 10. Foster Parents argue that, instead, the court improperly based its decision on the possibility that they, as legal parents, might terminate contact between the Children and their Maternal Aunt. The Foster Parents maintain that the court gave this biological relationship undue weight in its decision; the court did so despite Foster Parents' testimony that they would facilitate a relationship with Maternal Aunt. *Id.* at 10-11. According to Foster Parents, the court disregarded the best interests of the Children and left them unadoptable. *Id.* at 12. The Foster Parents conclude that the orphans' court's decision constituted an abuse of discretion. Upon review of the record, we agree.

In this case, by denying the Foster Parents' petitions the court ignored overwhelming evidence that adoption by Foster Parents was in the best interests of the Children. Both experts supported the adoption by the Foster Parents.

Dr. Chambers opined that adoption by Foster Parents was in the Children's best interests. In his report, Dr. Chambers observed that the most important factors in determining the best interests of the Children are bonding and attachment. He stated:

> Consistent with previous bonding evaluations, this evaluation revealed the [Foster Parents] to have a healthy and strong bond with both children. In addition, given the circumstances that the [Children faced in their earlier years, [Foster Parents] have done a remarkable job of getting the [C]hildren back on track developmentally. By all reports, the children are doing well academically, emotionally, and have positive peer relationships.
>
> ***
>
> [T]he bonding and attachment issues are paramount. The children clearly have strong healthy attachments with [Foster Parents] due to the fact that they have been in their lives every day for the past two years. The daily reciprocal parent-child interactions strengthen and support these bonds on an ongoing basis.

Dr. Bruce Chambers, Psychological Evaluation for Custody, January 23, 2023, at 9-10. Dr. Chambers found "that the [C]hildren are doing so well developmentally . . . and have a strong, healthy attachment to their foster parents." *Id.* As such, Dr. Chambers concluded: "In my opinion, it is in the best interest[s] of the [C]hildren for the adoption by [Foster Parents] to take place." *Id.* at 10-11. He further noted that, "the [C]hildren apparently are thriving in their care" despite claims that the Foster Parents could not manage biracial children. *Id.* at 11.

We acknowledge that Dr. Chambers also indicated in his report that the Children did not have a similar relationship with Maternal Aunt, but that continuing contact with her could help them:

> As stated earlier, there was no compelling evidence that these children have a strong attachment or bond with [Maternal Aunt]. However, having [Maternal Aunt] in the [C]hildren's lives in a typical aunt role, I believe, will help them understand their backgrounds and may help them with eventually the importance of the connection with their mother. To this end, I recommend that [Maternal Aunt] be granted contact with the [C]hildren, perhaps via Zoom every two weeks.

*Id.* But his recommendation that the Children maintain contact with Maternal Aunt did not negate Dr. Chambers' opinion that it was in the best interests of the children to be adopted by Foster Parents. Instead, this statement was a separate recommendation, unrelated to the primary factors determining their best interests.

At the hearing, Dr. Chambers testified that the Children should remain with Foster Parents:

> I think the [C]hildren are doing really well. That's the most important aspect of the evaluation. . . . So that speaks to the job [Foster Parents have] been doing. In addition to having a strong bond and attachment, the [C]hildren appear to be thriving and developmentally on track. Those are all very, very positive indicators that suggest that that situation should continue. There is no compelling reason for that to change as any change at this point in time would certainly be an undue stress on these [C]hildren. That clearly would not be in their best interest . . . but would also constitute, potentially, another traumatic event . . . .

N.T., 4/26/23, at 11.

- 10 -

Further, when the orphans' court asked Dr. Chambers what he would recommend if the court were convinced that Foster Parents would cut Maternal Aunt out of the Children's lives, Dr. Chambers answered: "It's going to be difficult in any case to disrupt these children. . . . . all I can say is the major protective factor for these children has been the attachment and bond and stability they've achieved with [Foster Parents]." *Id.* at 38. Thus, it is clear from Dr. Chambers testimony that despite the possibility of Foster Parents not facilitating a relationship with Maternal Aunt, Dr. Chambers still indicated that keeping the Children with Foster Parents on a permanent basis was the preferred outcome.

Moreover, there was no evidence that Foster Parents were unwilling to continue the relationship between the Children and Maternal Aunt. Instead, the evidence showed the opposite. *See* N.T., 4/26/23, at 125; N.T., 4/28/23, at 163-164. From our review of the record, it is unclear why the orphan's court was "convinced" that Foster Parents would not maintain this relationship, aside from some hesitancy by Foster Parents to allow unsupervised visits.

In addition to Dr. Chambers' expert opinion, Dr. Menta also recommended that the court grant Foster Parents' petitions. Dr. Menta reported that the Children have a strong, secure attachment to Foster Parents. She noted that the Children look to them for "guidance and security." She further indicated that the Children refer to them as "Mommy" and "Dad." Dr. Menta observed that Foster Parents have provided "consistent love, care, and

positive regard, and this has led to a positive, healthy attachment on the part of the children." Dr. Carolyn J. Menta, Bonding Assessment, January 27, 2021, at 5-6. Dr. Menta opined that:

> [The Children] clearly have a strong, secure attachment with [Foster Parents].
>
> ***
>
> These children have been through significant trauma. They have had disrupted attachment due to inconsistent care in the past. They are now in a consistent, structured, loving home and are strongly attached to their caregivers. It is in [the Children's] best interest to be able to continue to enjoy and sustain their positive, consistent, and clearly healthy bond with [Foster Parents].

Dr. Carolyn J. Menta, Bonding Assessment, July 25, 2021, at 4.

At the hearing, Dr. Menta testified about the existence of a secure and stable bond between the Children and Foster Parents and the Children's primary attachment to them. N.T., 4/28/23, at 176. Dr. Menta noted that the bond is very important as the Children grow and develop over time. *Id.* at 177. She further observed that losing a bond like this can be incredibly devastating for a child and significantly impact their mental health. *Id.* at 178. Importantly, when questioned by the court, Dr. Menta testified that the Children's bond with Foster Parents was the primary consideration. She stated: Ultimately, "I think the most harmful of the three options that [the court] listed would be the third in which you deny both parties' [petitions] and then these children would be faced with starting over from ground one." *Id.*

at 192. In her opinion, the best option for the court was to grant Foster Parents' petitions. *Id.* at 193.

Foster Parents also testified about their relationship with the Children and how they have loved and cared for them for the past three years. They testified about how the Children have improved and grown while in their care. Foster Parents elaborated on the activities they do with the Children and how they help them with their education. They talked about their extended family and indicated that some members are biracial, like the Children. Foster Parents expressed their willingness to work on a relationship with Maternal Aunt. *See* N.T., 4/26/23, at 118-126; N.T., 4/28/23, at 156-164.

Lastly, the guardian *ad litem* gave a statement to the court recommending that, in her opinion, the best interests of the Children would be to remain with Foster Parents and continue to see Maternal Aunt.[2] *Id.* at 258. Thus, the overwhelming evidence presented at the hearing was that adoption by Foster Parents was in the Children's best interests. Paradoxically, the orphans' court relied on this evidence to deny Maternal Aunt's petitions.

Essentially, the orphans' court attempted to mandate a post-adoption contact agreement, which the law only recognizes as a voluntary option when

---

[2] The guardian *ad litem* believed that the orphan's court was limited in its authority and that the best interests of the Children and the legal system did not align in this case. The guardian *ad litem* wanted to ensure the Children maintained a relationship with their biological family.

it is in the best interests of the child.  Specifically, Section 2731 of the Adoption Act provides:

> The purpose of this subchapter is to provide an option for adoptive parents and birth relatives to enter into a **voluntary** agreement for ongoing communication or contact that:
>
>> (1) is in the best interest of the child;
>>
>> (2) recognizes the parties' interests and desires for ongoing communication or contact;
>>
>> (3) is appropriate given the role of the parties in the child's life; and
>>
>> (4) is subject to approval by the courts.

23 Pa.C.S.A. § 2731 (emphasis added).

The Act does not authorize courts to require parties to enter this type of agreement as a pre-condition to an adoption, as the orphans' court attempted to do here.[3]  While the preservation of family is a consideration, "the goal of preserving the family unit cannot be elevated above all other factors when considering the best interests of the children but must be weighed in conjunction with other factors."  **K.D.**, 144 A.3d at 153.  Consequently, we

_____

[3] In fact, we have held that parents, whose relinquishment of their parental rights, was conditioned on a post-adoption contact agreement, did not "intelligently, voluntarily, and deliberately" consent to the termination of their rights. **See In re Adoption of A.W.**, 230 A.3d 1139, 1145 (Pa. Super. 2020) (citing **In re C.M.C.**, 140 A.3d 669, 711 (Pa. Super. 2016)).

Moreover, we have also found an abuse of discretion when an orphans' court denied a petition to terminate a parent's rights because the pre-adoptive caregiver refused to enter into a post-adoption contact agreement. **In re K.H.B.**, 107 A.3d 175, 183 (Pa. Super. 2014).

have held that it is an abuse of discretion for the orphans' court to rely exclusively on the biological nature of a relationship and contact with the blood relative when considering an adoption petition, rather than considering the entire record to determine what is in the best interests of a child. *Id.* at 152. Again, although the existence of a biological relationship is a relevant factor to consider when evaluating an adoption petition, it is not a controlling one. ***See Adoption of D.M.H.***, 683 A.2d at 319. By requiring the Foster Parents to enter such an agreement as a precursor to granting their adoption petitions, the court changed this type of agreement from voluntary to involuntary and defied the plain language of the statute.

The orphans' court said it refused to make a "Hobson's choice," and declined to pick the "lesser of two evils." Orphans' Court Opinion, at 5, 13. We appreciate the orphans' court's sincere attempt to do what it believed was in the Children's best interests. But what the court failed to understand is that the choice was not between two "objectionable alternatives." *Id*. at 6. The choice was between permanency and continued instability, the latter of which poses irreparable harm to children.

To be sure, by denying the Foster Parents' petitions, the orphans' court deprived the Children of permanency and left them with what Dr. Menta opined was the "most harmful" outcome. ***See*** N.T., 4/28/23, at 192. As our Supreme Court has stated, when courts fail to provide children with a ***permanent***, safe, stable, and loving home, the result is "all too often, []

catastrophically maladjusted children." ***In re T.S.M.***, 71 A.3d 251, 269 (Pa. 2013) (discussing the dangers of foster care drift).[4]

Based on the foregoing reasons, we conclude that the orphans' court's denial of Foster Parents' adoption petitions was manifestly unreasonable. The decision was not supported by the record evidence; the court further erred when it effectively mandated that Foster Parents enter a voluntary post-adoption contact agreement; and the court's decision resulted in the Children being left without permanency and at risk of being separated from the bond and attachment they have with Foster Parents. As the record makes clear, adoption by the Foster Parents best serves the Children's "physical, mental and emotional needs and welfare." ***See*** 23 Pa.C.S.A. § 2724(b); ***see also*** 23 Pa.C.S.A. § 2902(a). Therefore, we reverse the orphans' court's denial of Foster Parents' adoption petitions and remand for the court to grant these petitions. ***See K.D.***, 144 A.3d at 151.[5]

_____

[4] It appears the orphan's court recognized that its decision would keep the Children in dependency court, under supervision, and in legal custody of CYS, and would subject them to future permanency review hearings *indefinitely*. The court observed, "it is the strong hope of the court that [Maternal Aunt], with the cooperation of [Foster Parents] *and Indiana County CYS*, begin to enjoy the growth of a meaningful relationship with the Children, which will require periods of unsupervised physical "custody" of the Children by [Maternal Aunt]." ***See*** Orphans' Court Opinion at 16. (emphasis added).

[5] The effect of our decision means that Foster Parents will obtain full parental rights, including the right to decide whether the Children will continue to have contact with Maternal Aunt. We note Foster Parents indicated they would encourage this relationship, and we trust that they will continue to act in the Children's best interests.

Order reversed. Case remanded for entry of new decrees consistent with this opinion.   Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE:  3/7/2024