J-S17012-25 & J-S17013-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: T.B. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 217 EDA 2025 |

Appeal from the Order Entered January 3, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000839-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: K.N.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.B. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 218 EDA 2025 |

Appeal from the Order Entered December 23, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000172-2017

BEFORE:  MURRAY, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY MURRAY, J.:                    **FILED JUNE 2, 2025**

In these consolidated appeals, T.B.[1] appeals from the juvenile court's

orders denying his petition to adopt K.N.L., a female born in March 2010

_____

[1] In a prior appeal, our Supreme Court explained that T.B. "claimed he had been a romantic partner and longtime friend of [C]hild's biological mother, as well as a live-in parental caregiver for [C]hild from the time she was four days
*(Footnote Continued Next Page)*

(Child), and dismissing his custody complaint as moot.[2] After careful consideration, we affirm the orders.

As explained by the juvenile court,

[o]n March 31, 2015, at five years old, [Child] came into [the custody of the Philadelphia Department of Human Services (DHS)]. [Child] was removed from the care of [T.B.] and [T.B.'s] mother, [R.B.P.] [R.B.P.] was [Child's] legal guardian at the time. [Child] lived with [T.B.], whom she referred to as "dad," and [R.B.P.] from shortly after birth until her removal from their care. On August 3, 2015, [Child] was adjudicated dependent and fully committed to DHS. [Dependency Order, 8/3/15, at 1.] On March 6, 2017, the parental rights of [Child's] biological mother[ (biological mother)], putative father, and all unknown putative fathers were terminated. [Child] moved through numerous foster homes before being placed in her current foster home [with her foster mother, K.D. (Foster Mother).]

Juvenile Court Opinion, 12/23/24, at 1 (footnote omitted).

On October 24, 2018, following the termination of biological parents' rights to Child, S.G., Child's then foster mother, filed a petition to adopt Child.[3]

_____

old until her removal from R.B.P.'s home[.]" ***Interest of K.N.L.***, 284 A.3d 121, 127 (Pa. 2022). The ***K.N.L.*** Court further explained that the "initials 'T.B.' reflect the functional name of [T.B.], also known by 'L.B.' corresponding to his legal name and sex assigned at birth." ***Id.*** at 127 n.3; ***see also*** Juvenile Court Opinion, 12/23/24, at 1 n.1 (the juvenile court noting that T.B.'s sex "was assigned female at birth[.]").

[2] At 217 EDA 2025, T.B. appeals the juvenile court's order dismissing his custody complaint as moot. At 218 EDA 2025, T.B. appeals the juvenile court's order denying his adoption petition. We hereinafter refer to 217 EDA 2025 as the custody case, and 218 EDA 2025 as the adoption case.

[3] The certified record discloses that on March 26, 2019, biological mother sent correspondence to the Adoption Branch of the Philadelphia Court of Common Pleas' Family Division, objecting to Child's proposed adoption. Objection, *(Footnote Continued Next Page)*

DHS did not consent to the adoption and sought to remove Child from S.G.'s care. In the interim, on May 6, 2019, D.M., Child's maternal aunt (Aunt), filed a motion to intervene in S.G.'s adoption proceedings, and, on June 19, 2019, filed a petition to adopt Child.[4] S.G. subsequently withdrew her petition for adoption. In November 2019, DHS placed Child with Foster Mother.

On December 12, 2019, T.B. moved to intervene in Aunt's adoption proceedings, and filed his own petition to adopt Child on January 3, 2020. On January 26, 2021, the matter proceeded to a hearing, after which the juvenile court denied T.B.'s motion to intervene for lack of standing. The juvenile court additionally prohibited contact between T.B. and Child (the "stay-away" provision). Order, 1/26/21, at 1.

T.B. appealed, challenging, *inter alia*, the juvenile court's (1) standing ruling; and (2) "stay-away" provision. **See Interest of K.N.L.**, 264 A.3d 401, 409 EDA 2021 (Pa. Super. 2021) (unpublished memorandum at 7). This Court affirmed the juvenile court's order as to standing, but reversed the "stay-away" provision of the order. **Id.** (unpublished memorandum at 36, 43). Our

_____

3/26/19, at 1-2 (unpaginated). In response, the Adoption Branch sent biological mother correspondence informing her that her parental rights were terminated in 2017, and advising her to seek counsel "for further purposes regarding your intentions." Correspondence, 5/6/19, at 1. We observe that "[a] decree terminating all rights of a parent … entered by a court of competent jurisdiction shall extinguish the power or the right of the parent to object to or receive notice of adoption proceedings." 23 Pa.C.S.A. § 2521(a).

[4] Aunt filed an amended petition for adoption on February 26, 2020.

Supreme Court granted *allocatur* on the issue of T.B.'s standing. ***Interest of***

***K.N.L.***, 270 A.3d 1103 (Pa. 2022). On October 19, 2022, the Supreme Court

concluded "the juvenile court applied an incorrect analysis of [T.B.'s] standing

to intervene in an adoption based on his asserted *in loco parentis* status, and

therefore misapplied the law." ***K.N.L.***, 284 A.3d at 150. The ***K.N.L.*** Court

remanded the matter for a hearing *de novo* before a different judge. ***Id.*** at

151.[5]

In 2021, during the pendency of T.B.'s appeal, both T.B. and D.L.

(Grandmother) filed complaints seeking custody of Child. In his custody

complaint, T.B. asserted Child's "best interest and permanent welfare" would

be best served by awarding T.B. sole legal and physical custody of Child.

Custody Complaint, 8/6/21, at 2 (unpaginated). T.B. again asserted he had

standing because he had previously stood *in loco parentis* to Child, but

acknowledged that Child has been in DHS's care since 2015. ***Id.***

On February 14, 2022, the juvenile court continued the custody matter

pending the Supreme Court's decision regarding T.B.'s standing. Order,

---

[5] Upon remand, the matter was transferred from the Honorable Daine Grey, Jr., to the Honorable Deborah L. Canty, who presided over all subsequent proceedings pertinent to these appeals. On May 28, 2024, at the conclusion of T.B.'s case-in-chief at the adoption/custody hearing, the juvenile court found that T.B. had previously stood *in loco parentis* to Child, and, consequently, had standing to seek custody and adoption of Child. ***See*** N.T., 5/28/24, at 329; ***see also*** 23 Pa.C.S.A. § 5324(2) (providing that "[a] person who stands *in loco parentis* to the child" "may file an action … for any form of physical custody or legal custody.").

2/14/22. On March 25, 2022, Grandmother filed a petition to intervene in Aunt and T.B.'s adoption proceedings.

The juvenile court scheduled the matter for a contested adoption/custody hearing, which occurred in June and August 2023; and February, May, August, and October 2024. On February 20, 2024, the third day of the adoption/custody hearing, Grandmother filed a petition to adopt Child, which the juvenile court consolidated into the ongoing adoption/custody proceedings.

Numerous witnesses testified throughout the course of the adoption/custody proceedings, including, pertinently, Child; Foster Mother; DHS permanency caseworkers Tierra Graves (Ms. Graves) and Whitney Moore (Ms. Moore); Delta Family Services adoption finalization caseworker Erin Hagenbuch (Ms. Hagenbuch); and T.B.

Child, represented by separate legal counsel (Child's legal counsel) and a guardian *ad litem* (GAL), testified, *in camera*, on June 14, 2023, and February 20, 2024.[6] The juvenile court summarized Child's testimony as follows:

> On June 14, 2023, [Child] stated that she did not want to testify in front of [T.B.] or [Grandmother]. [Child] said that seeing them made her sad. She further elaborated that [Grandmother] was a stranger to her and that she just did not want to see [T.B.] [Child] said she was afraid of [T.B.] and that [T.B.] had shown up at her school and near [Foster Mother's] home unexpectedly, which

_____

[6] Child was thirteen years of age on the dates of her testimony, and fourteen years of age at the conclusion of the adoption/custody hearing.

frightened [Child] and made [Child] think she was going to be kidnapped. When speaking [about T.B.], [Child] would not raise her eyes. [Child] did indicate that she would be willing to testify in front of [Aunt] and [Foster Mother]. In the interest of fairness, all parties were asked to vacate the courtroom during [Child's] testimony. [Child] was brought back to testify a second time on February 20, 2024, to give all parties and counsel the opportunity to review the June 14, 2023[,] transcript of [Child's] testimony and allow for all counsel to re-examine [Child] …. On February 20, 2024, all parties were again asked to vacate the courtroom and only counsel was present for the second round of examination of [Child].

[Child] was consistent and clear in her testimony on both dates that she testified. [**Child**] **made it repeatedly clear, when asked by various people**[,] **both directly and in various iterations of the question,** [**that**] **she would only consent to being adopted by** [**Foster Mother,**] **and would not consent to adoption by** [**T.B.**, Aunt, or Grandmother]. ***See*** N.T., 6/14/23, at 31, 38-40, 42, 47-48, 79, 84; N.T., 2/20/24, at 5, 9, 11-12, 16-17, 29-32, 43, 60, 64-66, 75. [Child] was also consistent in her communication with GAL, who spoke with [Child] several times, that she wished to be adopted by [Foster Mother] and not by any other party. ***See*** N.T., 8/13/24, 190-91. [Child] was also consistent about her wishes in communication[s] with … [Ms. Graves], and … [Ms. Hagenbuch], both of whom me[]t with [Child] on a regular basis. ***See id.*** at 20, 197.

Juvenile Court Opinion, 12/23/24, at 4-5 (citations modified; emphasis added).

Concerning Child's relationship with Foster Mother, the juvenile court accurately summarized Child's testimony as follows:

[Child] adamantly wants to be adopted by [Foster Mother]. ***See*** N.T., 6/14/23, at 39-40, 42, 47, 79-80, 84; N.T., 2/20/24, at 5, 16-17, 30-32, 43, 58, 66-67. [Child] explain[ed], "Being with [Foster Mother] is like no other thing in my life. And it makes me feel safe, loved, cared [for.]" N.T. (Vol. II), 2/20/24, at 66-67. [Child] has lived with [Foster Mother] for the past five years. [Child] loves where she lives, she is very happy, she feels safe, loved, comfortable, and cared for. ***See*** N.T., 6/14/23, at 43, 47-

48; N.T. 2/20/24 (Vol. II), at 43, 66-67. [Child] calls [Foster Mother] "mom." N.T., 6/14/23, at 40; N.T. 2/20/24 (Vol. II), at 5. [Child] feels that she is part of [Foster Mother's] family, including having sisters[, *i.e.*, Foster Mother's eight-year-old foster daughter (Z.) and adult biological daughter,] and extended family. *See* N.T., 6/14/23, at 39-41, 43, 79-80. [Child] feels that no one else has taken as good [] care of her as [Foster Mother] does. *See* N.T., 6/14/23, at 42.

*Id.* at 5-6 (citations modified; footnote omitted).

Although Child acknowledged that as a "toddler" she "remember[ed] feeling safe with" T.B., **Child specifically testified that she would not consent to being adopted by T.B.** *See* N.T. (Vol. II), 2/20/24, at 5, 24; N.T., 6/14/23, at 38-39. As explained by the juvenile court,

[Child] no longer feels safe with [T.B.] *See* N.T., 6/14/23, at 80. [Child] does not want to restore the parent-child bond [Child] once had with [T.B.] *See* N.T. (Vol. II), 2/20/24, at 32. ….

….

Throughout her testimony, [Child] described the shift in her perception of [T.B.'s] involvement in her life. *See* N.T. (Vol. II), 2/20/24, at 39-41, 68. [Child] remembers [T.B.] visiting [Child while she was residing with S.G.], without DHS knowing, and [T.B.] telling [Child] not to tell anyone. *See* N.T. 6/14/23, at 31-33, 78; N.T. (Vol. II), 2/20/24, at 42. [Child] felt [that T.B.] was spying on [Child] based on [(1)] seeing [T.B.] "lurking" around; [(2)] seeing [T.B.'s] car at [Child's various foster parents' homes] at night; [(3) T.B.] telling [Child] that [T.B.] would stay in his car at [Child's foster homes] to make sure nothing happened; and [(4)] the [police] getting called to several of [Child's prior] foster homes[, which Child attributed to T.B.] *See* N.T., 6/14/23, at 65-69. [Child] believes that over the years, [T.B.] called the [police] with unfounded allegations against [Child's] various foster parents in an effort to have [Child] moved. *See* N.T. (Vol. II), 2/20/24, at 17-18. [Child] testified that [*T.B.*] *told* [*Child*] he would call the [police] to get [Child] moved when [Child] was in a couple different foster homes. *See id.* at 21. [Child] became afraid that [T.B.] would "kidnap" [Child] when [T.B.] showed up at a parking

lot down the street from [Foster Mother's] home. N.T., 6/14/23, at 33, 37-38, 42-46, 61-63.

Juvenile Court Opinion, 12/23/24, at 19-21 (citations and some punctuation modified; emphasis in original; footnote omitted).

Foster Mother testified that she is a sergeant in a correctional facility, and has worked in the prison system for twenty years. N.T., 8/13/24, at 40. Foster Mother has cared for Child since November 2019. *Id.* Foster Mother explained that she has an adult daughter in college, with whom Child has bonded. *Id.* at 39-40, 44. Foster Mother testified that she and Child reside with Z. *Id.* at 59-60. Foster Mother explained that Child and Z. have "a good relationship. They call each other sisters." *Id.* at 60; *see also id.* (Foster Mother testifying that Child and Z. are "not very close in age. So [Child] really, really flexes the big sister title ….").

According to Foster Mother, although Child initially told Foster Mother that she anticipated being transferred to another foster home,[7] Foster Mother has observed Child's behavior and outlook improve significantly during her time in Foster Mother's care. *See id.* at 41, 68; *see also id.* at 49 (Foster Mother testifying that she takes Child to therapy sessions, and that therapy has "been going well."), 67-68 (Foster Mother testifying that Child had described to her prior incidences of sexual and physical abuse).

_____

[7] Child testified that she was in six different foster homes before being placed with Foster Mother. *See* N.T. (Vol. II), 2/20/24, at 55.

Foster Mother testified that Child related to her that if Child saw T.B., Child "would call the police." N.T., 8/13/24, at 61. Foster Mother further explained that Child believed T.B. was responsible for Child being removed from Child's foster homes in the past. *See* N.T., 8/13/24, at 69 (Foster Mother testifying that Child told her that "[T.B.] comes to every foster home that [Child] goes to, and that's why [Child] has to move so much."). Foster Mother testified that, since Child's placement in Foster Mother's home, a person or persons made twenty reports to DHS concerning Foster Mother's care of Child, all of which were investigated and deemed unfounded. *Id.* at 81.

Ms. Hagenbuch testified that she began working with Child in May 2022. *Id.* at 15. Ms. Hagenbuch explained that her duties include conducting monthly supervisory visits and home safety checks, collecting documentation, and making "sure that the family is ready for adoption." *Id.* at 16. According to Ms. Hagenbuch, Foster Mother has been cooperative, communicative, and proactive throughout Ms. Hagenbuch's supervision of the case. *See id.* at 16-17.

Ms. Hagenbuch testified that Child and Foster Mother "have good communication. They enjoy spending time together. [Foster Mother] has been … loving and affectionate, and reassure[s Child] of her safety in their home." *Id.* at 18; *see also id.* (Ms. Hagenbuch confirming that Foster Mother and Child have a parent-child relationship). According to Ms. Hagenbuch, Child expressed her desire to be adopted by Foster Mother. *Id.* at 20. Ms.

Hagenbuch opined that it would be in Child's best interest to be adopted by Foster Mother. *Id.* at 24.

Ms. Graves testified as Child's DHS permanency caseworker, indicating that all of Child's needs are being met by Foster Mother. *Id.* at 11. Ms. Graves explained that, as one of her duties, she followed up with Child regarding Child's visits with T.B., Aunt, and Grandmother.[8] *See id.* at 12. According to Ms. Graves, Child declined to exercise periods of visitation with T.B., Aunt, or Grandmother. *See id.*; *see also* Juvenile Court Opinion, 12/23/24, at 20 (the juvenile court observing that Child "has declined visits with [T.B.] on a weekly basis since December 2023[.]" (record citations omitted)). Ms. Graves further confirmed her belief that Child's adoption by Foster Mother is in Child's best interest, and DHS consented to Foster Mother's adoption of Child. *Id.* at 197-98.

Ms. Graves explained that she visited T.B.'s home to assess "whether the home was appropriate or whether there were any issues." *Id.* at 206. Although the home was "structural[ly]" appropriate, Ms. Graves described her

_____

[8] On August 28, 2023, the juvenile court granted T.B. and Aunt's motions for visitation with Child, to occur at Child's discretion. Orders, 8/28/23, at 1. The juvenile court's orders directed DHS to ask Child, on a weekly basis, whether she wished to have virtual visits with either T.B. or Aunt. *Id.* Grandmother did not file a similar motion, and the record reveals no order directing or authorizing visitation between Grandmother and Child.

concerns, which were based on the fact that T.B. had not seen Child in four years at the time Ms. Graves conducted T.B.'s home assessment:

> So I did notice that [] there is a room [in T.B.'s home] for [Child]. However, … it looks as if [Child] is actually living in that room currently. … [T.B.] has clothes there from when [Child] was little. I believe [T.B.] even has clothes for an older child. I guess that [T.B.] got [the clothing] … just in case [Child] was placed with [T.B.]
>
> ….
>
> … [T]here were also sandals laid out on the floor as if someone had just stepped out of them.
>
> ….
>
> … [I]t was just concerning—it just appeared to be a little obsessive.

*Id.* at 207-08.

T.B., represented by counsel, called numerous witnesses, all of whom "testified largely consistent with each other[,]" to the following:

> [Child] had a parent-child relationship with [T.B.] and lived with [T.B.] from infancy. As a child, [Child] called [T.B.] "dad" or "daddy," [and T.B.] enrolled [Child] in preschool and cared for [Child] as her parent. [T.B.] had big birthday parties, barbeques, holidays and other family gatherings at which [Child] appeared happy and excited. Witnesses described [Child] as spoiled, having everything [Child] needed and more. … **Notwithstanding their testimony, none of [T.B.'s] witnesses have seen [Child] in the past few years.**

Juvenile Court Opinion, 12/23/24, at 22 (emphasis added).

T.B. testified that he and biological mother "planned to have [Child] together[,]" and that T.B. began caring for Child when Child was four days old. N.T., 5/28/24, at 89-90. T.B. testified that he fed and diapered Child,

took Child to medical appointments, and was involved in Child's education. *Id.* at 92, 94-95. According to T.B., he was Child's "primary parent" for Child's "entire life." *Id.* at 92-93. T.B. presented approximately 76 exhibits, including videos and photographs depicting moments of Child's time in T.B.'s care, as well as Child's school and therapy records. *See id.* at 109-73, 193-233; *see also id.* at 174 (T.B. opining that the exhibits "show how involved I am with [Child] and in [Child's] life.").

T.B. explained that while Child was in the care of S.G., T.B. would frequently take Child to school, assist Child with homework assignments, and see Child almost daily. *See id.* at 259-60; *see also id.* at 260-61 (T.B. agreeing that Child slept at T.B.'s house "most nights" during Child's placement with S.G.); *id.* at 275 (T.B. testifying that he received Child's report cards from S.G.). *But see* N.T., 6/14/23, at 32 (Child testifying that, when she lived in S.G.'s home, Child would see T.B. "[s]ometimes during the afternoon," and that on one occasion, T.B. took Child to Disney World). T.B. admitted that he was not in communication with DHS during Child's placement with S.G. *See id.*; *see also id.* at 242-43 (T.B. admitting that he took Child on vacations out-of-state on numerous occasions without DHS's consent).

As explained by the juvenile court, T.B. suggested that Child's testimony expressing fear of T.B. was the product of coercion:

> [T.B.] claim[ed], without proof, that [Child's] testimony [was somehow] influenced and that [Child] is under [duress]. *See* N.T., 5/28/24, at 302-04, 338; [*see also id.* at 304 (T.B. testifying, "I believe that someone is telling [Child] not to visit

with me, and that [Child] is not allowed to see me.")]. Despite [T.B.] reading the notes of [Child's] testimony …, where [Child] repeatedly and consistently state[d] that [Child] does not want contact with [T.B.] or to be adopted by [T.B.,] … [T.B.] insists that he knows [Child] better than anyone and that [Child] actually wants to be adopted by [T.B.] *See id.* at 244, 297, 337-38. [T.B.] testified, "I know [Child] better than anyone. My daughter wants to come home. … And the thing is, [Child is] being held from doing that." *Id.* at 175. Nevertheless, [T.B.] has not had direct contact with [Child] since shortly after [Child] was placed with [Foster Mother in 2019]. *See id.* at 217. When asked about his reaction to reading [Child's] testimony that [Child] is afraid [T.B.] would take [Child] away from [Foster Mother], [T.B.] responded, "I mean I was shocked …. Because that's not even my daughter. My daughter wouldn't even [] talk like that. That's not something [Child] would say. As you can see, I'm very involved with [Child] …. There's no way [Child] would be scared of her dad. Impossible …. Because I know my kid." *Id.* at 178-79. Despite not having seen [Child] in almost five years, [T.B.] insisted, "I mean all of this is just really new, it's really appalling to me. And I know what [Child] wanted. And I know what [Child] still wants."[9] *Id.* at 188-89.

Juvenile Court Opinion, 12/23/24, at 24-25 (citations modified; footnote in original omitted; one footnote added).

Ms. Moore, Child's DHS permanency caseworker while Child was placed with S.G., testified that T.B. did not contact DHS to request visits with Child or become a placement resource for Child. *See* N.T., 8/13/24, at 144-45. According to Ms. Moore, T.B. was to have no contact with Child, and S.G. did not advise Ms. Moore of any contact between Child and T.B. *See id.* at 143.

---

[9] The juvenile court observed that Child "expressed fear of this exact response: that if [Child] had contact with [T.B., Aunt, or Grandmother], 'They will probably start saying that I'm just making all of this up, but I'm not.'" Juvenile Court Opinion, 12/23/24, at 25 (quoting N.T. (Vol. II), 2/20/24, at 51-52).

Ms. Moore testified that Child reported to Ms. Moore "that there was a man residing in the basement of [S.G.]'s home[,]" but Ms. Moore was unable to ascertain the identity of this man. *See id.* at 143-44; *see also* N.T., 6/14/23, 32 (Child testifying that T.B. would enter S.G.'s home "from the back door in the basement, to give me some McDonald's [food] or bring me some toys to play with.").

Finally, the GAL reported to the juvenile court Child's wishes, based on his conversations with Child:

> [Child] was very sure that adoption is the goal that [Child] would be interested in[,] and not any other permanency options. We discussed the fact that [Child's] consent would be required for adoption due to her age, and we broke it down by each individual [adoption] petitioner. [Child] was very clear that she would only consent to [Foster Mother] adopting her, that [Child] would not consent to [T.B.] adopting her ….
>
> [Child] lives with [Z.], who[m] she identifies as being her sister. [Child] indicated that [Child and Z.] have a close relationship. And we talked about the possibility of if [Child] were removed from [Foster Mother's] home …. [Child stated s]he would be very sad if she were removed from [Foster Mother's] home, and she would miss [Foster Mother], [] who[m] she considers to be her mother, and [Z.] as well, that [Child] would be upset that she would not be with her sister anymore.
>
> [Child and the GAL] discussed [T.B.] … [E]very time that we spoke, and we spoke in the courthouse a couple of times, and we spoke at [Child's home with Foster Mother], [Child] always consistently says that she wants absolutely no contact with [T.B.] whatsoever. [Child] also avoided really talking about him.

N.T., 8/13/24, at 191-92.

The GAL continued,

- 14 -

> [i]n terms of [Foster Mother's] home, [Child] gave me a tour of the home. [Child is] happy there. It's an appropriate home. [Child] enjoys the school she goes to very much and [Child is] doing well there, and I think [Child] should remain there. [Child is] getting therapy regularly. And I think … with [Child's] history, maintaining therapy is really, really important for [Child]. And so ultimately the recommendation that I would have for the [c]ourt is for [Foster Mother's] petition for adoption be granted.

*Id.* at 194.

At the close of the evidentiary hearings, the juvenile court scheduled argument for October 30, 2024. At the October 2024 hearing, T.B. asserted that Child "has definitely been coached as to what to say." N.T., 10/30/24, at 21. T.B. claimed Child's fear of him was "irrational," and emphasized that T.B. previously cared for Child as a parent for years. *Id.* at 22-23.

By order, and a thorough accompanying opinion entered on December 23, 2024, the juvenile court denied T.B., Grandmother, and Aunt's petitions to adopt Child; granted Foster Mother's petition to adopt Child; and dismissed T.B. and Grandmother's custody complaints as moot.[10] T.B. filed timely notices of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statements at each docket number. The juvenile court filed a statement in lieu of a Rule 1925(a) opinion, directing this Court to its December 23, 2024, opinion.

_____

[10] The juvenile court's order denying T.B.'s adoption petition was filed on December 23, 2024; however, the order dismissing T.B.'s custody complaint, also dated December 23, 2024, was not docketed until January 3, 2025.

At the adoption case, T.B. raises the following issues:

A.   Whether [T.B.'s] petition for adoption was denied due to [T.B.'s] transgender identity and the brainwashing of [] Child over the years[?]

B.   Whether the [juvenile] court erred and abused its discretion when it denied [T.B.'s] petition for adoption[?]   Such denial was not in the best interest of [] Child.

C.   Whether [T.B.] presented evidence that indicated [] Child will have the resources, stability and a nurturing home and benefit from a supportive environment that promotes emotional, physical and educational development[?]

T.B.'s Brief (adoption case) at 4 (capitalization modified; issues reordered).

At the custody case, T.B. raises a single issue: "Whether the [juvenile] court erred and abused its discretion when it dismissed [T.B.'s] custody petition with prejudice as moot[?]  Such denial was not in the best interest of [C]hild."  T.B.'s Brief (custody case) at 4 (capitalization modified).

ADOPTION CASE

In his first adoption issue, T.B. claims that Child was coerced into refusing reunification with T.B.  **See** T.B.'s Brief (adoption case) at 9.  We reproduce T.B.'s scant argument in its entirety:

> [**T.B.**] **believes that** [**C**]**hild was influenced over the years to be alienated from** [**T.B.**] **and the family of** [**C**]**hild**.  When [Child] would speak to [T.B.,] she never expressed a fear of him.  It was very alarming to [T.B.] that [Child] said that after all these years she was afraid of [T.B.]  **See** N.T., 5/28/24, at 222-23.  [T.B.] believes that [C]hild was coerced and pressured into being fearful of [T.B.]  [T.B.] has been painted in a negative light to [Child] over the years.  [T.B.] maintains that people have told [C]hild not to call [T.B.] her "dad," and have also put in [Child's] mind to be afraid of him and her family.  **See id.** at 224-25.

- 16 -

T.B.'s Brief (adoption case) at 9 (citations modified; emphasis in original).

T.B.'s vague, underdeveloped argument baldly asserts his personal "belie[f]" that unnamed "people" have alienated Child from T.B., and have "coerced and pressured" Child into fearing T.B. *Id.* The only record evidence T.B. cites are his own statements made at the May 2024 adoption/custody hearing, recounting conversations T.B. had with Child several years prior to the adoption/custody hearing. *Id.*

T.B.'s argument lacks required specificity and supporting legal authority. *See* Pa.R.A.P. 2119(a) ("The argument shall be … followed by such discussion and citation of authorities as are deemed pertinent."); *Interest of D.C.*, 263 A.3d 326, 336 (Pa. Super. 2021) ("This Court will not act as counsel and will not develop arguments on behalf of an appellant." (citation and quotation marks omitted)). As T.B.'s "argument in support of this issue is substantially underdeveloped[,]" and because we conclude this deficiency "severely hampers out ability to conduct meaningful appellate review[,]" T.B.'s first adoption issue is waived. *Interest of D.C.*, 263 A.3d at 336.

We consider T.B.'s second and third adoption issues together, as they appear to present one issue under two headings. In his second adoption issue, after briefly reciting boilerplate adoption law, T.B. offers the following argument, which we quote in its entirety: "The evidence presented by [T.B.] at trial showed that it was in [Child's] best interest to be adopted by [T.B.]" T.B.'s Brief (adoption case) at 7.

In his third adoption issue, T.B. describes the evidence presented at trial that, he maintains, established that T.B.'s adoption of Child is in Child's best interest. *See id.* at 7-9 (T.B. detailing evidence of T.B. and Child's previous parent-child relationship, and citing numerous exhibits that he claims depict Child's happy childhood with T.B.). T.B. argues that he "raised [Child] as a single parent, and has been fighting hard for years to reunify with [C]hild to remove her from a system that he believes is failing her. [T.B.] testified that [Child] wants to come home (with [T.B.])[,] but is being held from doing so." *Id.* at 8.

> Our scope and standard of review are well settled:
>
> In matters arising under the Adoption Act, "our plenary scope of review is of the broadest type; that is, an appellate court is not bound by the trial court's inferences drawn from its findings of fact and is compelled to perform a comprehensive review of the record for assurance the findings and credibility determinations are competently supported." *K.N.L.*, 284 A.3d at 132-33 (internal quotations and further citations omitted). Additionally, our standard of review is for an abuse of discretion. This Court will not conclude that there is an abuse of discretion merely because we would have reached a different conclusion. *In re K.D.*, 144 A.3d 145, 151 (Pa. Super. 2016) (citation omitted). Rather, an appellate court "will find a trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will." *Id.* (citation omitted).

*In re Adoption of K.B.*, 311 A.3d 1166, 1169 (Pa. Super. 2024) (some citations modified).

"In adoption matters, the paramount concern is the best interests of the child. This determination is made on a case-by-case basis." *Id.* (citations

- 18 -

omitted). We have observed that "[t]he Adoption Act provides that 'the age, sex, health, social and economic status or racial, ethnic or religious background of the child or adopting parents shall not preclude an adoption[,] but the court shall decide its desirability on the basis of the physical, mental and emotional needs and welfare of the child.'" *Id.* (quoting 23 Pa.C.S.A. § 2724(b)).

"[A] third-party's *in loco parentis* status does not preclude another third-party from seeking custody under Section 5324(4)." ***Raymond v. Raymond***, 279 A.3d 620, 632 (Pa. Super. 2022). Additionally, the court "has the duty to consider the statements and opinions of the Guardian *Ad Litem* when making its determination of which family would better serve the bests interests of the child." ***In re K.D.***, 144 A.3d 145, 153 (Pa. Super. 2016) (citation omitted).

Significantly, we have "recognized that adoption in this Commonwealth is purely a statutory right …[, and] the provisions of the Adoption Act must be strictly complied with[.]" ***In re Adoption of D.G.J.***, 277 A.3d 1204, 1208 (Pa. Super. 2022). ***But see id.*** (observing that "[t]he law is not to be construed unreasonably and thus defeat the express purposes of the Act." (citation omitted)).

The Adoption Act mandates that consent to adopt be given by, *inter alia*, an adoptee or guardian of an adoptee under the following relevant circumstances:

**(a) General rule.--**Except as otherwise provided in this part, consent to an adoption shall be required of the following:

(1) The adoptee, if over 12 years of age.

* * *

(5) The guardian of the person of an adoptee under the age of 18 years, if any there be, or of the person or persons having the custody of the adoptee, if any such person can be found, whenever the adoptee has no parent whose consent is required.

23 Pa.C.S.A. § 2711(a)(1), (5); *see also In re Adoption of J.E.F.*, 864 A.2d 1207, 1210 (Pa. Super. 2004) (defining "guardian," as used in Section 2711(a)(5), as "[o]ne who has the legal authority and duty to care for another's person or property, esp. because of the other's infancy, incapacity, or disability." (quoting BLACK'S LAW DICTIONARY 725 (8th ed. 2004)). "**Our courts have no authority to decree an adoption in the absence of the statutorily required consents.**" *In re Adoption of D.*, 769 A.2d 508, 509 (Pa. Super. 2001) (emphasis added; citation omitted); *see also In re Adoption of S.P.T.*, 783 A.2d 779, 783 (Pa. Super. 2001) (holding the failure to secure required consents deprives adoption petitioners of standing to seek adoption).

Section 2713 of the Adoption Act provides that a court may, "in its discretion, [] dispense with consents **other than that of the adoptee to a petition for adoption** when: (1) the adoptee is over 18 years of age; or (2) the adoptee is under 18 years of age and has no parent living whose consent is required." 23 Pa.C.S.A. § 2713 (emphasis added; paragraph breaks

omitted)); ***see also In re E.M.***, 908 A.2d 297, 309 (Pa. Super. 2006) (in a termination of parental rights case, recognizing that the subject children, who were thirteen and fifteen years old, "need to consent to adoption at this point.").

Instantly, the juvenile court rejected T.B.'s claim that Child wants to be reunited with T.B.:

> Despite [T.B.'s] argument that [Child] has had a loving family fighting for [Child's] return, at this point, [Child] does not view [T.B.'s] efforts in the same light. [Child stated] that she remembers the vacations and parties and activities [that T.B.] offer[ed] as proof of a good childhood—yet [Child] does not want to return to [T.B. Child's] position is that no one has taken as good [] care of [Child] as [Foster Mother]. "Being with [Foster Mother] is like no other thing in my life," says [Child], "it makes me feel safe, loved, cared [for]." [Child's] childhood with [T.B.] has not been and will not be erased, but in [Child's] words, "[I]t's time to move on." N.T. (Vol. II), 2/20/24, at 12.

Juvenile Court Opinion, 12/23/24, at 31 (some citations modified).

The juvenile court further concluded that Child's consent was **required** for T.B. to be statutorily permitted to adopt Child, who was 14 years old at the conclusion of the adoption/custody hearing:

> [I]n order for this [c]ourt to grant the adoption of a child over the age of twelve to any petitioner, the Adoption Act requires the adoptee's consent. Without the consent of the child over the age of twelve, this [c]ourt cannot grant a petitioner's petition for adoption.
>
> There is no exception to the requirement of the consent of the adoptee over the age of twelve. Moreover, the legislature explicitly outlined that in certain circumstances "[t]he court, in its discretion, may dispense with consents ***other than that of the adoptee*** to a petition for adoption ...." 23 Pa.C.S.A. § 2713 (emphasis added). Though other required consents may be

- 21 -

waived at the [c]ourt's discretion, the adoptee's—if over the age of twelve—may not.

> [Child] is fourteen years old. Her consent to her adoption is required by 23 Pa.C.S.A. § 2711(a)(1) and, by law, this [c]ourt cannot dispense with her consent. [Child] made it repeatedly clear [that] she would only consent to being adopted by [Foster Mother]. [Child] was unwavering in that [Child] would not consent to her adoption by [T.B., Aunt, or Grandmother]. Neither caselaw nor statute allows for the [c]ourt to mandate a child over age twelve to be adopted by someone the child does not want to adopt her, nor would it be in [C]hild's best interest to do so.

*Id.* at 34-35 (capitalization modified; footnotes and some citations omitted; emphasis in original).

The juvenile court's factual findings are supported by the record and its legal conclusions are sound. We agree that Child's refusal to consent to adoption by T.B. is dispositive of T.B.'s second and third adoption issues. T.B.'s second and third adoption issues merit no relief.

Finally, in the adoption case, we note that Child's legal counsel has included in her brief a request for counsel fees. *See* Child's Brief at 36. Child's legal counsel argues that

> [b]ecause [C]hild did not consent to T.B.'s adoption of her and the [juvenile] court had no choice but to deny T.B.'s [petition for] adoption[ of Child], T.B.'s appeal is frivolous. Pursuant to [Pa.R.A.P.] 2744, this [C]ourt may award "a reasonable fee" "if it determines that an appeal is frivolous or taken solely for delay or that the conduct of the participant against whom costs are to be imposed is dilatory, obdurate or vexatio[us]." Pa.R.A.P. 2744. "[I]ssues that have already been resolved, or which present arguments running counter to well settled rules of law will be deemed frivolous by this Court. Such appeals are the proper subject for sanctions under Rule 2744." *Murphy v. Murphy*, 599 A.2d 647, 654 (Pa. Super. 1991).

*Id.* at 21-22; *see also id.* at 37 (noting Foster Mother's testimony that T.B. told Foster Mother that he will "drag this case out until [Child is] 18." (quoting N.T., 8/13/24, at 55-56)). T.B. did not file a reply brief responding to Child's legal counsel's request.

As a general rule, "parties to litigation are responsible for their own counsel fees and costs." *Werner v. Werner*, 149 A.3d 338, 346 (Pa. Super. 2016) (citation omitted). However,

> [p]ursuant to Pa.R.A.P. 2744, an appellate court may, in its discretion, award reasonable counsel fees against a party who has filed a frivolous appeal or whose behavior has been dilatory, obdurate or vexatious. In determining the propriety of such an award, we are ever guided by the principle that an appeal is not frivolous simply because it lacks merit. Rather, it must be found that the appeal has no basis in law or fact. This high standard is imposed in order to avoid discouraging litigants from bringing appeals for fear of being wrongfully sanctioned.

*Menna v. St. Agnes Med. Ctr.*, 690 A.2d 299, 304 (Pa. Super. 1997) (citations omitted).

Though T.B. waived his argument that Child's consent to be adopted was allegedly coerced, we do not determine that T.B.'s appeal is frivolous or that his conduct is obdurate or vexatious. T.B. clearly failed to adequately develop the consent issue, but we nevertheless decline to exercise our discretion to award counsel fees. Therefore, Child's legal counsel's request for counsel fees is denied.

<u>CUSTODY CASE</u>

- 23 -

In his sole issue in the custody case, T.B. argues that the juvenile court erred by dismissing his custody petition as moot. *See* T.B.'s Brief (custody case) at 5. T.B. does not address the effect that Foster Mother's adoption of Child had on T.B.'s custody complaint. Rather, T.B. baldly asserts that the juvenile court "was required to make a custody analysis[,] because the custody petition was before the [juvenile] court albeit contemporaneously with the adoption petition." *Id.* at 8.

"Mootness … is a question of law. Therefore, our scope of review is plenary; our standard is *de novo*." *Crespo v. Hughes*, 292 A.3d 612, 617 (Pa. Super. 2023) (citations and ellipsis omitted).

Concerning mootness, we have observed that

[a]s a general rule, an actual case or controversy must exist at all stages of the judicial process, or a case will be dismissed as moot. An issue before a court is moot when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy.

*Id.* (citations omitted).

We have stated that "[a] decree of adoption terminates forever all relations between a child and his biological parents and severs the child entirely from its own family tree and engrafts it upon its new parentage." *E.T.S. v. S.L.H.*, 54 A.3d 880, 883 (Pa. Super. 2012) (quoting *In re R.J.S.*, 889 A.2d 92, 100 n.7 (Pa. Super. 2005)).

Pertinently, the Child Custody Act describes the effect of adoption on certain parties seeking custody of a child:

> **Any rights to seek physical custody or legal custody rights and <u>any custody rights that have been granted under section 5324 (relating to standing for any form of physical custody or legal custody)</u> … prior to the adoption of the child by an individual other than a stepparent, grandparent or great-grandparent <u>shall be automatically terminated</u> upon such adoption**.

23 Pa.C.S.A. § 5326 (emphasis added).

Instantly, recognizing the above-cited authority, the juvenile court concluded T.B.'s custody complaint was terminated when the juvenile court granted Foster Mother's petition to adopt Child:

> As [Foster Mother] is not a stepparent, grandparent or great-grandparent, pursuant to [Section] 5326, [T.B.'s] right to file for custody as a person *in loco parentis* … [was] automatically terminated upon [Child's] adoption. … The law is that adoption effectively severs [C]hild entirely from her previous family tree and wholly engrafts her into her new family with all the rights and protections thereof. ***See R.J.S.***, 889 A.2d at 100 n.7.

Juvenile Court Opinion, 12/23/24, at 38 (quotation marks and some citations omitted).

We agree with the conclusion of the juvenile court, as it comports with applicable law. ***See Crespo***, 292 A.3d at 617. When the juvenile court granted Foster Mother's petition to adopt Child, T.B. lost any right to pursue physical or legal custody of Child. ***See*** 23 Pa.C.S.A. § 5326; ***see also E.T.S.***, 54 A.3d at 883. Consequently, any ruling on T.B.'s custody complaint could not "have any practical effect on the existing controversy." ***Crespo***, 292 A.3d at 617. Accordingly, T.B.'s challenge to the juvenile court's denial of T.B.'s custody complaint as moot is without merit.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/2/2025