J-S17014-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.N.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.M. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 313 EDA 2025 |

Appeal from the Order Entered January 3, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000172-2017

BEFORE: MURRAY, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY MURRAY, J.: **FILED JUNE 9, 2025**

D.M. (Aunt), maternal aunt of K.N.L., a female born in March 2010 (Child), appeals from the juvenile court's order denying her petition to adopt Child. After careful consideration, we affirm.

As explained by the juvenile court,

[o]n March 31, 2015, at five years old, [Child] came into [the custody of the Philadelphia Department of Human Services (DHS)]. [Child] was removed from the care of [T.B.][1] and [T.B.'s] mother, [R.B.P.] [R.B.P.] was [Child's] legal guardian at the time.

_____

[1] In a prior appeal, our Supreme Court explained that T.B. "claimed he had been a romantic partner and longtime friend of [C]hild's biological mother, as well as a live-in parental caregiver for [C]hild from the time she was four days old until her removal from R.B.P.'s home[.]" **Interest of K.N.L.**, 284 A.3d 121, 127 (Pa. 2022). The **K.N.L.** Court further explained that the "initials 'T.B.' reflect the functional name of [T.B.], also known by 'L.B.' corresponding to his legal name and sex assigned at birth." **Id.** at 127 n.3; **see also** Juvenile Court Opinion, 12/23/24, at 1 n.1 (the juvenile court noting that T.B.'s sex "was assigned female at birth[.]").

> [Child] lived with [T.B.], whom she referred to as "dad," and [R.B.P.] from shortly after birth until her removal from their care. On August 3, 2015, [Child] was adjudicated dependent and fully committed to DHS. [Dependency Order, 8/3/15, at 1.] On March 6, 2017, the parental rights of [Child's] biological mother[ (biological mother)], putative father, and all unknown putative fathers were terminated. [Child] moved through numerous foster homes before being placed in her current foster home [with her foster mother, K.D. (Foster Mother).]

Juvenile Court Opinion, 12/23/24, at 1 (footnote in original omitted; one footnote added).

On October 24, 2018, following the termination of biological parents' rights to Child, S.G., Child's then foster mother, filed a petition to adopt Child.[2] DHS did not consent to the adoption and sought to remove Child from S.G.'s care. In the interim, on May 6, 2019, Aunt filed a motion to intervene in S.G.'s adoption proceedings. *See* Motion to Intervene, 5/6/19, at 1 (unpaginated) (Aunt averring, "It's my responsibility and sole duty to step up as [Child's maternal] aunt to adopt [Child] and to keep our family together."). On June

---

[2] The certified record discloses that on March 26, 2019, biological mother sent correspondence to the Adoption Branch of the Philadelphia Court of Common Pleas' Family Division, objecting to Child's proposed adoption. Objection, 3/26/19, at 1-2 (unpaginated). In response, the Adoption Branch sent biological mother correspondence informing her that her parental rights were terminated in 2017, and advising her to seek counsel "for further purposes regarding your intentions." Correspondence, 5/6/19, at 1. We observe that "[a] decree terminating all rights of a parent … entered by a court of competent jurisdiction shall extinguish the power or the right of the parent to object to or receive notice of adoption proceedings." 23 Pa.C.S.A. § 2521(a).

19, 2019, Aunt filed a petition to adopt Child.[3]  S.G. subsequently withdrew her petition to adopt Child.  In November 2019, DHS placed Child with Foster Mother.

On December 12, 2019, T.B. moved to intervene in Aunt's adoption proceedings, and filed his own petition to adopt Child on January 3, 2020. Following a hearing, the juvenile court denied T.B.'s motion to intervene for lack of standing.  T.B. appealed and, ultimately, on October 19, 2022, our Supreme Court concluded that "the juvenile court applied an incorrect analysis of [T.B.'s] standing to intervene in an adoption based on his asserted *in loco parentis* status, and therefore misapplied the law."  *K.N.L.*, 284 A.3d at 150. The *K.N.L.* Court remanded the matter for a hearing *de novo* on standing before a different judge.  *Id.* at 151.[4]

_____

[3] Aunt filed an amended petition seeking her unsubsidized adoption of Child on February 26, 2020.  In the amended petition, Aunt asserted that Child "has not resided with [Aunt] due to the refusal of [DHS] to permit such placement." Amended Adoption Petition, 2/26/20, ¶ 5.

[4] Upon remand, the matter was transferred from the Honorable Daine Grey, Jr., to the Honorable Deborah L. Canty, who presided over all subsequent proceedings pertinent to this appeal.  On May 28, 2024, at the conclusion of T.B.'s case-in-chief at the adoption/custody hearing, the juvenile court found that T.B. had previously stood *in loco parentis* to Child, and, consequently, had standing to seek custody and adoption of Child.  *See* N.T., 5/28/24, at 329; *see also* 23 Pa.C.S.A. § 5324(2) (providing that "[a] person who stands *in loco parentis* to the child" "may file an action … for any form of physical custody or legal custody.").

In 2021, during the pendency of T.B.'s appeal, both T.B. and D.L., Child's maternal grandmother (Grandmother), filed complaints seeking custody of Child. On February 14, 2022, the juvenile court continued the custody matter pending the Supreme Court's decision regarding T.B.'s standing. Order, 2/14/22. On March 25, 2022, Grandmother filed a petition to intervene in Aunt's and T.B.'s adoption proceedings.

The juvenile court conducted a contested adoption/custody hearing in June and August 2023; and February, May, August, and October 2024. On February 20, 2024, the third day of the adoption/custody hearing, Grandmother filed a petition to adopt Child, which the juvenile court consolidated into the ongoing adoption/custody proceedings.

Numerous witnesses testified throughout the course of the adoption/custody proceedings, including, pertinently, Child; Foster Mother; DHS permanency caseworkers Tierra Graves (Ms. Graves) and Whitney Moore (Ms. Moore); Delta Family Services adoption finalization caseworker Erin Hagenbuch (Ms. Hagenbuch); and Aunt.

Child, represented by separate legal counsel (Child's legal counsel) and a guardian *ad litem* (GAL), testified, *in camera*, on June 14, 2023, and February 20, 2024.[5] The juvenile court summarized Child's testimony as follows:

_____

[5] Child was thirteen years of age on the dates of her testimony, and fourteen years of age at the conclusion of the adoption/custody hearing.

On June 14, 2023, [Child] stated that she did not want to testify in front of [T.B.] or [Grandmother].  [Child] said that seeing them made her sad.  She further elaborated that [Grandmother] was a stranger to her and that she just did not want to see [T.B.]  [Child] said she was afraid of [T.B.] and that [T.B.] had shown up at her school and near [Foster Mother's] home unexpectedly, which frightened [Child] and made [Child] think she was going to be kidnapped.  When speaking of [T.B.], [Child] would not raise her eyes.  [Child] did indicate that she would be willing to testify in front of [Aunt] and [Foster Mother].  In the interest of fairness, all parties were asked to vacate the courtroom during [Child's] testimony.  [Child] was brought back to testify a second time on February 20, 2024, to give all parties and counsel the opportunity to review the June 14, 2023[,] transcript of [Child's] testimony and allow for all counsel to re-examine [Child] ….  On February 20, 2024, all parties were again asked to vacate the courtroom and only counsel was present for the second round of examination of [Child].

[Child] was consistent and clear in her testimony on both dates that she testified.  [**Child**] **made it repeatedly clear, when asked by various people**[**,**] **both directly and in various iterations of the question,** [**that**] **she would only consent to being adopted by** [**Foster Mother,**] **and would not consent to adoption by** [**T.B., Aunt, or Grandmother**]. ***See*** N.T., 6/14/23, at 31, 38-40, 42, 47-48, 79, 84; N.T., 2/20/24, at 5, 9, 11-12, 16-17, 29-32, 43, 60, 64-66, 75.  [Child] was also consistent in her communication with GAL, who spoke with [Child] several times, that she wished to be adopted by [Foster Mother] and not by any other party.  ***See*** N.T., 8/13/24, 190-91.  [Child] was also consistent about her wishes in communication[s] with … [Ms. Graves], and … [Ms. Hagenbuch], both of whom me[]t with [Child] on a regular basis.  ***See id.*** at 20, 197.

Juvenile Court Opinion, 12/23/24, at 4-5 (citations modified; emphasis added).

Concerning Child's relationship with Foster Mother, the juvenile court accurately summarized Child's testimony as follows:

> [Child] adamantly wants to be adopted by [Foster Mother]. **See** N.T., 6/14/23, at 39-40, 42, 47, 79-80, 84; N.T., 2/20/24, at 5, 16-17, 30-32, 43, 58, 66-67. [Child] explain[ed], "Being with [Foster Mother] is like no other thing in my life. And it makes me feel safe, loved, cared [for.]" N.T. (Vol. II), 2/20/24, at 66-67. [Child] has lived with [Foster Mother] for the past five years. [Child] loves where she lives, she is very happy, she feels safe, loved, comfortable, and cared for. **See** N.T., 6/14/23, at 43, 47-48; N.T. 2/20/24 (Vol. II), at 43, 66-67. [Child] calls [Foster Mother] "mom." N.T., 6/14/23, at 40; N.T. 2/20/24 (Vol. II), at 5. [Child] feels that she is part of [Foster Mother's] family, including having sisters[, *i.e.*, Foster Mother's eight-year-old foster daughter (Z.) and adult biological daughter,] and extended family. **See** N.T., 6/14/23, at 39-41, 43, 79-80. [Child] feels that no one else has taken as good [] care of her as [Foster Mother] does. **See** N.T., 6/14/23, at 42.

*Id.* at 5-6 (citations modified; footnote omitted).

Child testified that she could not recall the last time she saw Aunt. **See** N.T., 6/14/23, at 29; **see also id.** at 31 (Child testifying that the "last time I saw [Aunt], her house was, like, bad in there. … [Aunt] had [] clothes everywhere on the floor, cigarettes, and some ashes."). Although Child testified that she would be comfortable with visiting Aunt at Foster Mother's discretion, **Child specifically denied wanting to be adopted by Aunt**. *Id.* at 31, 47-48. As explained by the juvenile court,

> [Child] was clear that she does not want to be adopted by [Aunt]. **See** N.T., 6/14/23, at 31, 39, 48, 84; N.T. (Vol. II), 2/20/24, at 6, 11-12, 30-31, 60, 64, 75. [Child] remembers visits[,] supervised by DHS[,] that [Child] used to have with [Aunt], and [Child] described them as "good." N.T., 6/14/23, at 29. In addition to DHS[-]supervised visits with [Aunt], [Child] remembers [T.B.] taking [Child] to [Aunt's] home to visit [Child's] cousins while [Child] was living in foster care. **See id.** at 30. [Child] recalls [Aunt] smoking and drinking alcohol, and the poor condition of [Aunt's] home, which [Child] cite[d] as the reasons she would not want to be adopted by [Aunt]. **See id.** at 29-30;

*see also id.* at 31, 57; N.T. (Vol. II), 2/20/24, at 10-11, 58-59, 63.

[Child] was less clear about whether or not she would like to visit with or have any contact with [Aunt] and [Child's] biological cousins moving forward. During [Child's] testimony in court, [Child's] opinion oscillated on whether she would like to have any contact with [Aunt] or biological siblings or cousins, but [Child] was clear that any contact [Child] was comfortable with would [occur] after [Child] was adopted by [Foster Mother], as [Child] expressed fear that contact with her biological family might threaten her adoption by [Foster Mother]. *See* N.T., 6/14/23, at 48-50, 73-76, 80-81; N.T. (Vol. II), 2/20/24, at 7-9, 11-12, 30-31, 51-52, 60, 64. **[Child] fears that visits with [Aunt] might give way to contact with [T.B.] or [T.B.] obtaining information about [Child], which [Child] does not want.**[6] *See* N.T., 6/14/23, at 74-76. [Child] predicted her family members would get [Child] moved[ from Foster Mother], saying [Child] was "just making all of this up."[7] N.T. (Vol. II), 2/20/24,

_____

[6] The juvenile court explained that

[Child] no longer feels safe with [T.B.] *See* N.T., 6/14/23, at 80. … [Child] felt [that T.B.] was spying on [Child] based on [(1)] seeing [T.B.] "lurking" around; [(2)] seeing [T.B.'s] car at [Child's various foster parents' homes] at night; [(3) T.B.] telling [Child] that [T.B.] would stay in his car at [Child's foster homes] to make sure nothing happened; and [(4)] the [police] getting called to several of [Child's] foster homes[, which Child attributed to T.B.] *See* N.T., 6/14/23, at 65-69. … [Child] testified that [*T.B.*] *told* [*Child*] he would call the [police] to get [Child] moved when [Child] was in a couple different foster homes. *See id.* at 21. [Child] became afraid that [T.B.] would "kidnap" [Child] when [T.B.] showed up at a parking lot down the street from [Foster Mother's] home. N.T., 6/14/23, at 33, 37-38, 42-46, 61-63.

Juvenile Court Opinion, 12/23/24, at 19-21 (citations and some punctuation modified; emphasis in original; footnote and some paragraph breaks omitted).

[7] Confirming Child's fear, the juvenile court observed Aunt's statement that "despite reading [Child's] testimony, [Aunt] did not believe [Child]." Juvenile Court Opinion, 12/23/24, at 11 (citing N.T. 8/28/23, at 111, 131; N.T. (Vol. I), 2/20/24, at 128.)

at 51-52. … [Child] is comfortable with [Foster Mother], as [Child's] adoptive mother, determining who [Child] visits. *See id.* at 47-48.

Juvenile Court Opinion, 12/23/24, at 10-11 (citations modified; footnote in original omitted; footnotes and emphasis added).

Foster Mother testified that she is a sergeant in a correctional facility, and has worked in the prison system for twenty years. N.T., 8/13/24, at 40. Foster Mother has cared for Child since November 2019. *Id.* Foster Mother explained that she has an adult daughter in college, with whom Child has bonded. *Id.* at 39-40, 44. Foster Mother testified that she and Child reside with Z. *Id.* at 59-60. Foster Mother explained that Child and Z. have "a good relationship. They call each other sisters." *Id.* at 60; *see also id.* (Foster Mother testifying that Child and Z. are "not very close in age. So [Child] really, really flexes the big sister title ….").

According to Foster Mother, although Child initially told Foster Mother that she anticipated being transferred to another foster home,[8] Foster Mother has observed Child's behavior and outlook improve significantly during her time in Foster Mother's care. *See id.* at 41, 68; *see also id.* at 49 (Foster Mother testifying that she takes Child to psychological therapy sessions, and that therapy has "been going well."), 67-68 (Foster Mother testifying that Child had detailed past trauma to Foster Mother).

_____

[8] Child testified that she was in six different foster homes before being placed with Foster Mother. *See* N.T. (Vol. II), 2/20/24, at 55.

Foster Mother explained that Child expressed concern that if Child visited Aunt, T.B. "might be there, or [A]unt may tell [T.B.] that [Child is] there." N.T., 8/13/24, at 64. Concerning continued contact with Child's biological family, Foster Mother testified that she would facilitate that contact "if that's what [Child] wants. When the time comes, we'll have that conversation, but I'm not saying [] once [Child is] adopted [Child] can never have contact with [her] biological family. … That's where [Child] comes from." *Id.*

Ms. Hagenbuch testified that she began working with Child in May 2022. *Id.* at 15. Ms. Hagenbuch explained that her duties include conducting monthly supervisory visits and home safety checks, collecting documentation, and making "sure that the family is ready for adoption." *Id.* at 16. According to Ms. Hagenbuch, Foster Mother has been cooperative, communicative, and proactive throughout Ms. Hagenbuch's supervision of the case. *See id.* at 16-17.

Ms. Hagenbuch testified that Child and Foster Mother "have good communication. They enjoy spending time together. [Foster Mother] has been … loving and affectionate, and reassure[s Child] of her safety in their home." *Id.* at 18; *see also id.* (Ms. Hagenbuch confirming that Foster Mother and Child have a parent-child relationship). Ms. Hagenbuch further testified that Child expressed her desire to be adopted by Foster Mother. *Id.* at 20;

*see also id.* at 24 (Ms. Hagenbuch opining that it would be in Child's best interest to be adopted by Foster Mother).

Ms. Graves testified as Child's DHS permanency caseworker, indicating that all of Child's needs are being met by Foster Mother. *Id.* at 11. Ms. Graves explained that, as one of her duties, she followed up with Child regarding Child's visits with T.B., Aunt, and Grandmother.[9] *See id.* at 12. According to Ms. Graves, Child declined to exercise periods of visitation with T.B., Aunt, or Grandmother. *See id.*; *see also* Juvenile Court Opinion, 12/23/24, at 12 (the juvenile court observing that Child "has not agreed to any visits[ with Aunt], stating [Child] does not remember [Aunt] well and does not wish to get to know [Aunt] or have a continued relationship with [Aunt] at this point[.]" (citations omitted)). Ms. Graves further confirmed her belief that Child's adoption by Foster Mother is in Child's best interest, and stated that DHS consented to Foster Mother's adoption of Child. *Id.* at 197-98.

Aunt, represented by counsel, testified that she and Child had a strong relationship after Child's birth. N.T., 8/28/23, at 50. Aunt explained that she filed her petition to adopt Child "[b]ecause I wanted [Child] with family. I

---

[9] On August 28, 2023, the juvenile court granted T.B.'s and Aunt's motions for visitation with Child, to occur at Child's discretion. Orders, 8/28/23, at 1. The juvenile court's orders directed DHS to ask Child, on a weekly basis, whether she wished to have virtual visits with either T.B. or Aunt. *Id.* Grandmother did not file a similar motion, and the record reveals no order directing or authorizing visitation between Grandmother and Child.

didn't want [Child] in some stranger's home[.]" ***Id.*** at 67; ***see also*** N.T. (Vol. I), 2/20/24, at 112 (Aunt testifying in T.B.'s case-in-chief, "I think [Child] should be with family. … [T.B.] is family." (paragraph break omitted)). Prior to Child entering DHS custody, Aunt testified that she would have visits with Child on "[h]olidays, birthdays, [and] regular parties." ***Id.***

Although Aunt initially stated that DHS never removed any children from her custody, Aunt later confirmed that DHS removed one of Child's biological siblings from Aunt's care on an unspecified date. ***See id.*** at 51, 61-62; ***see also id.*** at 76 (Aunt agreeing that DHS removed Child's sibling from Aunt's care after Aunt tested positive for marijuana). Aunt testified that DHS thwarted her efforts to maintain a relationship with Child in retaliation for Aunt allegedly "getting [Ms. Moore] fired[.]" ***Id.*** at 54.[10] Aunt additionally confirmed her belief that Child "was coached to say [Aunt's] home was a mess[,]" and "was coached to say that [Child] saw [Aunt] smoking and drinking[.]" ***Id.*** at 60.

Aunt explained that she has known T.B. "[a]ll [her] life[,]" and that Aunt and T.B. are "[f]riends." ***Id.*** at 87; ***see also id.*** at 109 (Aunt confirming that she "consider[s T.B.] family" based on T.B.'s prior parental bond with Child). When asked how she "feel[s] about [T.B.] resuming the responsibility of being

---

[10] The juvenile court observed that Ms. Moore "was, in fact, never fired from DHS, but was promoted to her current supervisory position." Juvenile Court Opinion, 12/23/24, at 17 (citing N.T., 8/28/23, at 114; N.T., 8/13/24, at 109).

a dad to [Child,]" Aunt responded, "I think it's a good thing." *Id.* at 113; *see also id.* (Aunt elaborating that life with T.B. was "all [Child] knew. The other people she knew are strangers."); N.T. (Vol. I), 2/20/24, at 126 (in T.B.'s case-in-chief, Aunt agreeing that "**an adoption [by Aunt] would also mean a relationship for [Child] with** [G]randmother … [a]nd with **her dad,** [**T.B.**]" (paragraph breaks omitted; emphasis added)). Aunt testified that she spent time with Child while Child was in T.B.'s care. *Id.* at 91. However, Aunt denied that T.B. ever took Child to Aunt's home. *Id.* at 93. *But see* N.T., 6/14/23, at 30 (Child testifying that T.B. took Child to Aunt's house to visit with biological cousins while Child was in foster care); N.T., 8/28/23, at 105 (Aunt testifying, "Yes, [T.B.] has brought [Child] to my house[.]").

Ultimately, Aunt agreed that if Child did not want to be adopted by Aunt, she would respect Child's wishes, testifying, "I want [Child] to be happy. I just want [Child] to be happy." N.T., 8/28/23, at 103; *see also id.* at 132 (Aunt acknowledging that Child "feels safe, loved, and protected by [Foster Mother.]"); N.T. (Vol. I), 2/20/24, at 119 (Aunt stating that if Child desired to be adopted by Foster Mother, Aunt "would have to" support that decision).

Ms. Moore testified that DHS began exploring alternative placement resources for Child after developing concerns about S.G.'s "ability to care for [C]hild long[-]term[.]" N.T., 8/13/24, at 111. According to Ms. Moore, DHS considered Aunt as a potential placement resource for Child in 2019. *See id.* at 111-12. DHS permitted Aunt to have supervised visits with Child despite

concerns stemming from Aunt's drug use and the fact that DHS had previously removed one of Child's siblings from Aunt's care. *See id.* at 153-54.

Ms. Moore explained that DHS eventually rejected Aunt as a placement resource for Child, the reasons for which the juvenile court aptly summarized:

> [Ms.] Moore explained that it was [a] culmination of concerns that led DHS to stop [Aunt's] supervised visits and discontinue consideration of [Aunt] as a placement resource for [Child]. *See* N.T., 8/13/24, at 153-157, 188. The main reason was that it appeared [Aunt] "was trying to sabotage [Child's] placement …[,] which led to the deterioration of [Child's] well-being." *Id.* at 162. During supervised visits, [Aunt] spent a significant amount of time interrogating [Child] about [Child's] placement, impressing upon [Child] that [Child] was being mistreated by [S.G.], and trying to ascertain the confidential location of [Child's] placement. *See id.* at 113-15, 162-65, 180-81, 183-86. Throughout this time, [Child's] behavior deteriorated. [Child] became increasingly aggressive after visits[ with Aunt], escalating to an incident in [Ms. Moore's vehicle,] wherein [Child] began kicking, screaming, banging her head on the ceiling of the [vehicle], and trying to break out of the window. *See id.* at 115-17. [Child] was "inconsolable" and "shut down" after visits [with Aunt] …. *Id.* at 145-46, 157. At one point, [Child] barricaded herself in her room and broke through a window in an attempt to run[ ]away from [S.G.'s] home to [Aunt's] home. *See id.* at 117. Ultimately, [Child's] placement [with S.G.] was disrupted and [Child] was placed in the home of [Foster Mother.] *See id.* at 172-77.

Juvenile Court Opinion, 12/23/24, at 17-18 (citations modified).

Finally, the GAL reported Child's wishes, which he learned during conversations with Child:

> [Child] was very sure that adoption is the goal that [Child] would be interested in[,] and not any other permanency options. We discussed the fact that [Child's] consent would be required for adoption due to her age, and we broke it down by each individual [adoption] petitioner. [**Child**] **was very clear that she would only consent to** [**Foster Mother**] **adopting her, that** [**Child**] **would not consent to** … [**A**]**unt adopting her.**

- 13 -

[Child] lives with [Z.], who[m] she identifies as being her sister. [Child] indicated that [Child and Z.] have a close relationship. And we talked about the possibility of if [Child] were removed from [Foster Mother's] home …. [Child stated s]he would be very sad if she were removed from [Foster Mother's] home, and she would miss [Foster Mother], [] who[m] she considers to be her mother, and [Z.] as well, that [Child] would be upset that she would not be with her sister anymore.

….

In terms of other relatives, like the maternal family, [Child's desires] changed somewhat. So in the beginning of the case[, Child] indicated that she would be open … to visiting maternal family members. Recently[,] I asked [Child] about the same things, and she said that she absolutely did not want contact with those family members.

I think just based on talking to [Child] and knowing about the case, that the reason that[ Child is] saying that is because she associates [T.B.] with her maternal family at this point. So there is a concern that [] opening the door to them would also open the door to [T.B.'s involvement] in her life.

N.T., 8/13/24, at 191-93 (emphasis added).

The GAL continued,

[i]n terms of [Foster Mother's] home, [Child] gave me a tour of the home. [Child is] happy there. It's an appropriate home. [Child] enjoys the school she goes to very much and [Child is] doing well there, and I think [Child] should remain there. [Child is] getting therapy regularly. And I think … with [Child's] history, maintaining therapy is really, really important for [Child]. And so ultimately[,] the recommendation that I would have for the [c]ourt is for [Foster Mother's] petition for adoption [to] be granted.

*Id.* at 194.

At the close of the evidentiary hearings, the juvenile court scheduled

argument for October 30, 2024. At the October 2024 hearing, Aunt challenged

- 14 -

Child's accounts about the untidy nature of Aunt's house and Aunt's alcohol consumption. *See* N.T., 10/30/24, at 17. Aunt further claimed that Child withheld her consent to be adopted by Aunt because she was "under duress." *Id.* at 19.

By order, and a thorough accompanying opinion entered on December 23, 2024, the juvenile court denied Aunt's, T.B.'s, and Grandmother's petitions to adopt Child; granted Foster Mother's petition to adopt Child; and dismissed T.B.'s and Grandmother's custody complaints as moot. Aunt filed a timely notice of appeal[11] and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statement. The juvenile court filed a statement in lieu of a Rule 1925(a) opinion, directing this Court to its December 23, 2024, opinion.

Aunt raises the following two issues:

1. Did the [juvenile] court appropriately consider evidence of child coaching/duress when it determined that [C]hild's consent to adopt was valid?

2. Did the [juvenile] court appropriately consider [C]hild's best interest when it denied [Aunt's] petition for unsubsidized adoption[ of Child]?

Aunt's Brief at 2 (issues reordered).

_____

[11] Although the juvenile court's order was filed December 23, 2024, the docket reflects that the parties were not served copies of the order until January 3, 2025. *See* Pa.R.A.P. 108(a)(1) (providing that the date of entry of an order is the day on which the clerk of courts mails or delivers copies of the order to the parties). Thus, Aunt's appeal is timely.

In her first issue, Aunt argues that the juvenile court "erred when it failed to consider whether [Child's] consent was provided intelligently, voluntarily and deliberately[,] or whether it was the product of fear or duress[.]" *Id.* at 8.

Aunt failed to include this issue in her Rule 1925 concise statement; it is therefore waived. *See J.S. v. R.S.S.*, 231 A.3d 942, 951 (Pa. Super. 2020) (in a child custody case, finding that an appellant waived an issue for appellate review where it was not included in his Rule 1925 concise statement); *O.G. v. A.B.*, 234 A.3d 766, 781 n.9 (Pa. Super. 2020) (same); *In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) (in an involuntary termination of parental rights case, finding that an appellant waived an issue on appeal for failing to include the issue in her Rule 1925 concise statement, stating, "[**T**]**his Court has no discretion in choosing whether to find waiver. Waiver is mandatory, and this Court may not craft *ad hoc* exceptions or engage in selective enforcement**." (citation omitted; emphasis added)).[12]

_____

[12] Even if preserved, we would conclude the evidence supports the juvenile court's finding that "[Child] did not appear to be under any undue influence, coercion, duress and did not appear to have been coached in the testimony that [Child] provided; rather, [Child's] testimony appeared to be based upon her own beliefs and opinions formed as a result of her experiences." Juvenile Court Opinion, 12/23/24, at 5; *see also In re M.J.S.*, 903 A.2 1, 8 (Pa. Super. 2006) (observing that we review a trial court's adoption determination for an abuse of discretion, and stating that "we will not reverse [the trial court's] credibility determinations absent an abuse of that discretion." (citation omitted)).

In her second issue, Aunt argues that the juvenile court erred by denying her petition to adopt Child, because "[g]ranting [Aunt's] adoption petition would have been in the best interests of [Child.]" Aunt's Brief at 6. Aunt continues, "[u]nder the law, an individualized analysis of [Child's] best interests should have been expressed in the [juvenile] court's opinion[.]" *Id.*[13]

Our scope and standard of review are well settled:

In matters arising under the Adoption Act, "our plenary scope of review is of the broadest type; that is, an appellate court is not bound by the trial court's inferences drawn from its findings of fact and is compelled to perform a comprehensive review of the record for assurance the findings and credibility determinations are competently supported." *K.N.L.*, 284 A.3d at 132-33 (internal quotations and further citations omitted). Additionally, our standard of review is for an abuse of discretion. This Court will not conclude that there is an abuse of discretion merely because we would have reached a different conclusion. *In re K.D.*, 144 A.3d 145, 151 (Pa. Super. 2016) (citation omitted). Rather, an appellate court "will find a trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will." *Id.* (citation omitted).

_____

[13] Within the same section of her brief, Aunt raises two additional arguments: (1) DHS's refusal to place Child with Aunt "impaired [Child's] relationship with [Aunt]"; and (2) the juvenile court, in adjudicating Aunt's petition for visitation, "could have ordered supervised visits[,] which would have served to even the playing field in the adoption proceedings …." Aunt's Brief at 6-7. Aunt did not cite legal authority supporting these issues or include them in her Pa.R.A.P. 1925 concise statement. Therefore, these issues are waived. *See In re M.Z.T.M.W.*, 163 A.3d at 466; *see also Interest of D.C.*, 263 A.3d 326, 336 (Pa. Super. 2021) (stating that "each question an appellant raises is to be supported by discussion and analysis of pertinent authority," and recognizing that this Court "will not act as counsel and will not develop arguments on behalf of an appellant." (citations omitted)).

*In re Adoption of K.B.*, 311 A.3d 1166, 1169 (Pa. Super. 2024) (some citations modified).

"In adoption matters, the paramount concern is the best interests of the child. This determination is made on a case-by-case basis." *Id.* (citations omitted). We have observed that

> [t]he Adoption Act provides that 'the age, sex, health, social and economic status or racial, ethnic or religious background of the child or adopting parents shall not preclude an adoption[,] but the court shall decide its desirability on the basis of the physical, mental and emotional needs and welfare of the child.'

*Id.* (quoting 23 Pa.C.S.A. § 2724(b)).

The preservation of the biological family is a consideration in adoption proceedings; however, "the goal of preserving the family unit cannot be elevated above all other factors when considering the best interests of the children but must be weighed in conjunction with other factors." *Id.* at 1174 (citation omitted). Indeed, a court commits an abuse of discretion where it relies "exclusively on the biological nature of a relationship and contact with blood relative[s] when considering an adoption petition, rather than considering the entire record to determine what is in the best interests of a child." *Id.* (citation omitted). Additionally, the court "has the duty to consider the statements and opinions of the Guardian *Ad Litem* when making its determination of which family would better serve the bests interests of the child." *In re K.D.*, 144 A.3d 145, 153 (Pa. Super. 2016) (citation omitted).

We have "recognized that adoption in this Commonwealth is purely a statutory right …[, and] the provisions of the Adoption Act must be strictly complied with[.]" *In re Adoption of D.G.J.*, 277 A.3d 1204, 1208 (Pa. Super. 2022). *But see id.* (observing that "[t]he law is not to be construed unreasonably and thus defeat the express purposes of the Act." (citation omitted)).

Pertinently, the Adoption Act mandates that consent to adopt be given by, *inter alia*, an adoptee or guardian of an adoptee, under the following relevant circumstances:

> **(a) General rule.--**Except as otherwise provided in this part, consent to an adoption shall be required of the following:
>
> (1) The adoptee, if over 12 years of age.
>
> * * *
>
> (5) The guardian of the person of an adoptee under the age of 18 years, if any there be, or of the person or persons having the custody of the adoptee, if any such person can be found, whenever the adoptee has no parent whose consent is required.

23 Pa.C.S.A. § 2711(a)(1), (5); *see also In re Adoption of J.E.F.*, 864 A.2d 1207, 1210 (Pa. Super. 2004) (defining "guardian," as used in Section 2711(a)(5), as "[o]ne who has the legal authority and duty to care for another's person …, esp. because of the other's infancy, incapacity, or disability." (quoting BLACK'S LAW DICTIONARY 725 (8th ed. 2004)). "**Our courts have no authority to decree an adoption in the absence of the statutorily required consents.**" *In re Adoption of D.*, 769 A.2d 508, 509

(Pa. Super. 2001) (emphasis added; citation omitted); *see also In re Adoption of S.P.T.*, 783 A.2d 779, 783 (Pa. Super. 2001) (holding the failure to secure statutorily-prescribed consents deprives adoption petitioners of standing to seek adoption).

Section 2713 of the Adoption Act provides that a court may, "in its discretion, [] dispense with consents **other than that of the adoptee to a petition for adoption** when: (1) the adoptee is over 18 years of age; or (2) the adoptee is under 18 years of age and has no parent living whose consent is required." 23 Pa.C.S.A. § 2713 (emphasis added; paragraph breaks omitted)); *see also In re E.M.*, 908 A.2d 297, 309 (Pa. Super. 2006) (in a termination of parental rights case, recognizing that the subject children, who were thirteen and fifteen years old, "need to consent to adoption at this point.").

Instantly, the juvenile court concluded that Child's consent was **required** for Aunt to be statutorily permitted to adopt Child, who was 14 years old at the conclusion of the adoption/custody hearing:

> [I]n order for this [c]ourt to grant the adoption of a child over the age of twelve to any petitioner, the Adoption Act requires the adoptee's consent. Without the consent of the child over the age of twelve, this [c]ourt cannot grant a petitioner's petition for adoption.
>
> There is no exception to the requirement of the consent of the adoptee over the age of twelve. Moreover, the legislature explicitly outlined that in certain circumstances[,] "[t]he court, in its discretion, may dispense with consents **other than that of the adoptee** to a petition for adoption …." 23 Pa.C.S.A. § 2713 (emphasis added). Though other required consents may be

waived at the [c]ourt's discretion, the adoptee's—if over the age of twelve—may not.

> [Child] is fourteen years old. Her consent to her adoption is required by 23 Pa.C.S.A. § 2711(a)(1) and, by law, this [c]ourt cannot dispense with her consent. [Child] made it repeatedly clear [that] she would only consent to being adopted by [Foster Mother]. [Child] was unwavering in that [Child] would not consent to her adoption by [Aunt, T.B., or Grandmother]. Neither caselaw nor statute allows for the [c]ourt to mandate a child over age twelve to be adopted by someone the child does not want to adopt her, nor would it be in [C]hild's best interest to do so.

Juvenile Court Opinion, 12/23/24, at 34-35 (capitalization modified; footnotes and some citations omitted; emphasis in original).

The juvenile court's factual findings are supported by the record and its legal conclusions are sound. Aunt's failure to secure Child's consent precluded the juvenile court from entering an adoption decree in Aunt's favor. **See In re Adoption of S.P.T.**, 783 A.2d at 783; **In re Adoption of D.**, 769 A.2d at 509. Therefore, we agree that Child's refusal to consent to adoption by Aunt is dispositive of Aunt's second issue.

Finally, we note that Child's legal counsel has included in her brief a request for counsel fees. **See** Child's Brief at 36. Child's legal counsel argues that

> [s]ince [C]hild did not consent to Aunt's adoption of her and the [juvenile] court had no choice but to deny Aunt's [petition for] adoption[ of Child], Aunt's appeal is frivolous. Pursuant to [Pa.R.A.P.] 2744, this [C]ourt may award "a reasonable fee" "if it determines that an appeal is frivolous or taken solely for delay or that the conduct of the participant against whom costs are to be imposed is dilatory, obdurate or vexatio[us]." Pa.R.A.P. 2744. "[I]ssues that have already been resolved, or which present arguments running counter to well settled rules of law will be

deemed frivolous by this Court. Such appeals are the proper subject for sanctions under Rule 2744." ***Murphy v. Murphy***, 599 A.2d 647, 654 (Pa. Super. 1991).

***Id.*** at 35-36.

As a general rule, "parties to litigation are responsible for their own counsel fees and costs." ***Werner v. Werner***, 149 A.3d 338, 346 (Pa. Super. 2016) (citation omitted). However,

> [p]ursuant to Pa.R.A.P. 2744, an appellate court may, in its discretion, award reasonable counsel fees against a party who has filed a frivolous appeal or whose behavior has been dilatory, obdurate or vexatious. In determining the propriety of such an award, we are ever guided by the principle that an appeal is not frivolous simply because it lacks merit. Rather, it must be found that the appeal has no basis in law or fact. This high standard is imposed in order to avoid discouraging litigants from bringing appeals for fear of being wrongfully sanctioned.

***Menna v. St. Agnes Med. Ctr.***, 690 A.2d 299, 304 (Pa. Super. 1997) (citations omitted).

Though Aunt waived her argument that Child's consent to be adopted was allegedly invalid, we do not determine that Aunt's appeal is frivolous or that her conduct is obdurate or vexatious. Aunt clearly failed to comply with procedural rules regarding the preservation of Aunt's consent issue. Nevertheless, we decline to exercise our discretion to award counsel fees. Therefore, Child's legal counsel's request for counsel fees is denied.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>6/9/2025</u>